Linda B. SMITH, f/k/a Linda B. Dinerstein, Plaintiff,

v.

THE PAUL REVERE LIFE INSURANCE COMPANY, Defendant.

No. 95–6960–CIV–GOLD.

United States District Court, S.D. Florida.

Nov. 14, 1997.

G. William Allen, Jr., Ft. Lauderdale, FL, for Linda B. Smith.

Leonor M. Lagomasino, Miami, FL, for Paul Revere Life Ins.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE came before the Court on Defendant's "Corrected Motion for Summary Judgment," and plaintiff's "Response to Defendant's Corrected Motion for Summary Judgment." Plaintiff Linda B. Smith's action arises under a policy of disability insurance ("Policy"), issued to Ms. Smith by defendant The Paul Revere Life Insurance Company ("Paul Revere"). Ms. Smith contends that Paul Revere coerced her into signing a release ("Release"), discharging Paul Revere from its obligations under the Policy in exchange for a lump sum settlement payment worth only a fraction of the Policy's cash value. Defendant Paul Revere asserts that it is entitled to summary judgment as a matter of law.

Ms. Smith's amended complaint presents the Court with two issues, 1) whether the alleged coercive behavior of Paul Revere, in light of Ms. Smith's "weakness of mind,"

constitutes duress or undue influence warranting rescission of the Release, and 2) whether Paul Revere issued the Policy to Ms. Smith with an attached Supplemental Social Insurance Rider ("SSI Rider"). After careful consideration of the parties' arguments, the relevant case law and the record as a whole, this Court concludes that defendant's motion for summary judgment should be granted.

*I. Findings of Fact and Procedural Background*

The following facts are gleaned from the pleadings, other relevant documents and deposition testimony. In October, 1987, Ms. Smith became totally disabled from her occupation as a private investigator due to chronic depression. Pursuant to the terms of the Policy, on the 31st day of her disability, Paul Revere began to pay Ms. Smith disability benefits of two thousand ($2,000.00) dollars per month, the first $1,400 to which Ms. Smith was entitled until age 65. Ms. Smith was entitled to receive the remaining six hundred ($600.00) dollar monthly benefit until the 365th day of Ms. Smith's disability. On the 366th day of the Policy, Ms. Smith was to receive an additional six hundred ($600.00) dollar monthly payment pursuant to the SSI Rider.

Paul Revere informed Ms. Smith that under the terms of the Policy, she was obligated to apply for Social Security Benefits from the Social Security Administration. (Smith Depo., p. 31). On October 20, 1988, Ms. Smith's first application was rejected. (Smith Depo., p. 31; Def. Exh. 2). With assistance from Claire Tacher, an attorney provided by Paul Revere, Ms. Smith re-submitted her application to Social Security and was approved for such benefits in May, 1991. (Smith Depo., p. 34). Paul Revere then reduced Ms. Smith's monthly indemnity from $2,000 to $1,400, in accordance with the terms of the SSI Rider.[1]

After qualifying to receive social security benefits, Ms. Smith testified in deposition that she began to have problems with Paul Revere. Although Ms. Smith stated that she continued to receive checks from Paul Revere until the date of settlement, (Smith Depo., p. 89), she alleged that Paul Revere was sending her benefit checks late,[2] and that she was entitled to more than $1,400 a month.[3] As a result of her "desperate" financial problems, Ms. Smith authorized her former husband, Steven Dinerstein, to contact Paul Revere on her behalf to negotiate a lump-sum "buy out" of the Policy.[4] *Id.* at 81.

Ms. Smith and Mr. Dinerstein sent a joint letter to Paul Revere dated November 6, 1992, confirming their interest in a buyout of each of Ms. Smith and Mr. Dinerstein's respective disability policies.[5] (Smith Depo., p.

1. Paul Revere contends that it paid the $600.00 monthly benefit pursuant to the SSI Rider until Ms. Smith qualified for social security benefits. According to the terms of the SSI Rider, Ms. Smith was then no longer entitled to the $600 monthly benefit. Ms. Smith contends that she never received the SSI Rider, and therefore, Paul Revere never should have reduced her benefits under the Policy.

2. Ms. Smith stated in deposition that Paul Revere's lack of timeliness one month resulted in her eviction from her apartment. She further stated that the one time she called Paul Revere for an explanation, she was told that Paul Revere had until the 15th of the month to deliver her check. (Smith Depo., p. 70–71).

3. In a letter dated December 28, 1991, from Ms. Smith to Paul Revere, Ms. Smith sought clarification of her benefits under the Policy after Paul Revere reduced her benefits to $1,400 per month. The letter stated: "I was to receive a benefit of $2,000 per month for the combined premium of $1,296.00 and for an additional premium of $79.86, I was to receive the optional

additional benefit of $600.00 per month when not receiving Social Security or if receiving such a benefit the difference between the benefit and the $600.00." (*Id.* at 50, Def. Exh. 4.)

4. Mr. Dinerstein is a former detective with the District Attorneys Office in Brooklyn, New York, and in 1972, he went to work for the Public Defenders Office in the Southern District of Florida. In 1978, Mr. Dinerstein formed his own private investigation agency, where he continued to work with Ms. Smith until 1986, when he went on disability. (Medical Report of Jerome F. Bergheim, M.D., p. 2). During the relevant time period to this Motion, Mr. Dinerstein was also on disability and was receiving benefits under his own policy with Paul Revere. Mr. Dinerstein, however, is not a party plaintiff to this suit and his policy is not at issue.

5. Although Ms. Smith did not remember this letter, it was sent to Paul Revere over her signature. *Id.* at 84. She did, nevertheless, remember that she and Mr. Dinerstein had first approached Paul Revere about the possibility of a buyout of her Policy. *Id.* at 97.

83; Def. Exh. 7). The letter references a phone call some weeks prior in which the possibility of a buyout had been discussed. The letter also explains that under their respective policies, Paul Revere would be obligated to pay Ms. Smith and Mr. Dinerstein an aggregate of 43 years of benefits at $16,800 per year. Ms. Smith and Mr. Dinerstein stated that they were not seeking that amount in settlement, but rather would settle for a "reasonable amount."

In a letter dated November 23, 1992, from Paul Revere to Mr. Dinerstein, a representative of Paul Revere stated that the company would not consider a settlement offer of the equivalent of seven years of benefits for each policy. (Id.; Def. Exh. 8). Mr. Dinerstein responded with a letter dated November 27, 1992, which letter Ms. Smith remembered, with an offer worth ten-years of benefits for each policy. Id. Ms. Smith understood that Paul Revere had rejected this offer. Id.

As a condition of Ms. Smith's continued receipt of her benefit payments, the Policy required Ms. Smith to obtain certification from her treating physician each month attesting to her continued disability. In March, 1993, Paul Revere received notification from Ms. Smith's psychiatrist, Dr. Burton Cahn, that Dr. Cahn had not treated Ms. Smith since June, 1992, and that he had not signed a claim form since March 30, 1992. (Cahn Depo., p. 11, 14). Ms. Smith had submitted claim forms after June, 1992, which purported to contain Dr. Cahn's signature. Id. at 11–14.

Upon learning of this situation, Paul Revere arranged a meeting between Ms. Smith, Mr. Dinerstein and one of its field representatives, Dominic Faracci, to investigate this issue. (Smith Depo., p. 95). On May 26, 1993, Mr. Faracci met with Ms. Smith at the home of Mr. Dinerstein. In the presence of Mr. Dinerstein, Mr. Faracci allegedly threatened to cut off all further payments under the Policy and to prosecute Ms. Smith for submitting fraudulent claim forms. Id. at 75. Mr. Faracci also intimated that Ms. Smith's only option was to settle out the Policy.[6] Ms. Smith "yelled at him and threw him out."[7] Id. at 75.

Prior to leaving, Mr. Faracci recommended that Ms. Smith contact Rich Dauphinais at Paul Revere to discuss settlement. Ms. Smith complied with Mr. Faracci's suggestion because she "was aware of the fact that I wasn't going to get any money and possibly go to jail." Id. at 96. Over a series of conversations with Mr. Dauphinais, Ms. Smith and Mr. Dauphinais agreed to a lump sum settlement payment of the equivalent of four years of benefits.[8] Id. at 100. Ms. Smith sought the advice of Mr. Dinerstein on whether to accept this settlement offer, and he advised her not to take the offer. Id. at 104.

Mr. Dauphinais arranged a second meeting between Mr. Faracci and Ms. Smith, to provide Ms. Smith with the agreed upon lump-sum settlement payment. On September 21, 1993, Mr. Faracci met with Ms. Smith at Mr. Dinerstein's home. Ms. Smith stated in deposition that Mr. Dinerstein was not present at this meeting.[9] Id. at 104. According to Ms. Smith, Mr. Faracci treated her rudely once again, abruptly demanding that she sign a paper acknowledging receipt of the $67,200 payment. Id. at 101–102.

Ms. Smith originally filed this action on June 28, 1995, in the Circuit Court of the 17th Judicial Circuit in and for Broward

---

6. As discussed above, Ms. Smith first broached the subject of settling out the Policy for a lump sum payment. In a letter dated November 6, 1992, from Ms. Smith to Paul Revere, Ms. Smith references a phone call made sometime prior to this letter where the possibility of buyout was discussed.

7. Although Paul Revere denies that Mr. Faracci threatened Ms. Smith in this manner, for purposes of this Motion, Paul Revere admits these allegations as true.

8. Ms. Smith agreed with opposing counsel that Mr. Dauphinais was pleasant and cooperative.

Id. at 101. Mr. Dauphinais in no way threatened Ms. Smith. Id.

9. Mr. Dinerstein, however, represented in his deposition that he was present at the second meeting between Ms. Smith and Mr. Faracci. Mr. Dinerstein further stated that Mr. Faracci had threatened Ms. Smith at this meeting, telling her that if she did not take the check "we are going to go after you for every dime that you've got." (Dinerstein Depo., at 71). Mr. Dinerstein also stated that Mr. Faracci had given her a check for an amount less than what Ms. Smith and Mr. Dauphinais had previously agreed. Id.

County, Florida. On October 11, 1995, defendant timely removed the case to federal court pursuant to 28 U.S.C. §§ 1332 and 1441. In Ms. Smith's Amended Complaint, date filed February 6, 1996, plaintiff sought declaratory relief, damages, costs, and attorney's fees as provided by law against Paul Revere.

On October 7, 1997, defendant Paul Revere filed the motion now before the Court. Paul Revere argues that the Release is binding because, 1) mere weakness of mind is not grounds to rescind a contract under Florida state law, and 2) "threatening" a party with legal action, even criminal prosecution, does not constitute duress where the accusing party is legally justified in seeking such prosecution. In response, Ms. Smith argues that an examination of all the circumstances in this case, including Ms. Smith's chronic depression, Paul Revere's knowledge of that condition, and Mr. Faracci's belligerent threats of criminal prosecution, create a jury question of whether Paul Revere exerted undue influence and whether Ms. Smith signed the Release under duress.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen vs. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra*). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646.

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 595 (5th Cir.1981). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tyson Foods, Inc.*, 121 F.3d at 646; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d 538 (1986).

## III. Discussion and Analysis

Duress is a condition of mind produced by improper external pressure that destroys the free agency of the party compelled to act in a manner not of his or her own volition. *Cooper v. Cooper*, 69 So.2d 881 (Fla.1954). "Undue influence must amount to over-persuasion, duress, force, coercion, or artful or fraudulent contrivances to such a degree that there is a destruction of free agency and willpower." *Jordan v. Noll*, 423 So.2d 368, 370 (Fla. 1st DCA 1982). In determining whether a complainant acted under his or her own free will, a court should take into consideration all circumstances surrounding the transaction, including the age, sex, state of health and level of knowledge of the complaining party. *Burton v. McMillan*, 52 Fla. 469, 42 So. 849, 851 (1907). The burden of proof to show duress or coercion in the execution of a legal instrument lies with the party claiming duress. *Cowen v. Cowen*, 95 So.2d 584, 586 (Fla.1957). As a general rule, a threat of lawful arrest does not constitute duress, which would authorize a court of equity to set aside an instrument executed by the threatened party. *See Tyler v. Hill Bros.*, 127 Fla. 419, 173 So. 147 (1937); *Franklin v. Wallack*, 576 So.2d 1371, 1372 (Fla. 5th DCA 1991); *Scutti v. State Road Department*, 220 So.2d 628, 630 (Fla. 4th DCA 1969). In addition, "mere mental weakness will not authorize a court of equity to set aside a deed if such weakness does not amount to inability to comprehend the effect and nature of the transaction and is not accompanied by evidence of imposition or undue influence." *Hassey v. Williams*, 127 Fla. 734, 174 So. 9, 11 (1937); accord *Long v.*

*Moore*, 626 So.2d 1387, 1388–89 (Fla. 1st DCA 1993) (citing *Hartnett v. Lotauro*, 82 So.2d 362 (Fla.1955)); *Douglas v. Ogle*, 80 Fla. 42, 85 So. 243 (1920) (holding that mere weakness of mind is not sufficient ground to set aside agreement).

## A.  Ms. Smith's Mental Competence

■ Guided by the above-stated principles, it is incumbent upon this Court to determine if a jury question exists as to whether Paul Revere exercised undue influence to undermine Ms. Smith's will in her decision to sign the Release. The Court must first determine whether plaintiff had the capacity to understand the significance of signing the Release at the time that she executed that document. Plaintiff asserts that she did not. In support of this contention, plaintiff submits an evaluation from her psychiatrist Dr. Burton Cahn, which describes Ms. Smith's mental health as of December 17, 1990. Dr. Cahn stated that Ms. Smith is "extremely anxious and depressed," that she cannot concentrate, and that her ability to use her comprehension was "extremely poor." Plaintiff also submits a report by Dr. Jerome E. Bergheim, dated May 2, 1988. Dr. Bergheim stated that Ms. Smith "seemed to have difficulty managing routine affairs, and the item content she endorsed suggested poor memory, concentration problems, and an inability to make decisions."

These evaluations of Ms. Smith's mental health, however, are far from one sided. Dr. Cahn characterized Ms. Smith as a "bright" woman with "good" comprehension. Dr. Bergheim described Ms. Smith as "an alert, well oriented, and cooperative depressed white female in no acute distress," with "no evidence of delusions or hallucinations." The Court also questions the relevance of Dr. Cahn's December, 1990 evaluation, which was performed almost three years prior to the time that Ms. Smith signed the Release. Dr. Bergheim's evaluation is even more dated.

More illuminating is Dr. Cahn's deposition testimony. Dr. Cahn testified that "she was able to handle her own financial affairs," (Cahn Depo., p. 20), that she could understand the consequences of a buyout, *Id.* at 31, that she was not delusional, *Id.* at 33, and that her concentration was variable, at times she concentrated "well" and at others, not at all. *Id.* at 26.

Dr. Cahn's conclusions are buttressed by those of Dr. Jacqueline Berryer who saw Ms. Smith in July and September, 1993. Dr. Berryer found that Ms. Smith was "ambulatory and alert," "clean, polite and cooperative," "oriented to the three spheres [time, place and person] with good memory," (Berryer Depo., Psychiatric Note, Sept. 2, 1993). Dr. Berryer further concluded that there was "no evidence of any delusional thinking," (Berryer Depo., Psychiatric Note, Sept. 2, 1993), and finally that Ms. Smith was competent. (Berryer Depo., p. 19).

Most important for this Court's purposes is Ms. Smith's own deposition testimony. Ms. Smith stated in her deposition that she understood the significance of the buyout. Specifically, Ms. Smith recognized that she would receive a one-time settlement payment and would no longer receive her monthly benefit.[10] The Court, therefore, finds that Ms. Smith, although suffering from chronic depression, had the capacity to appreciate the significance of accepting the $67,200 lump sum settlement payout in exchange for discharging Paul Revere from all future liability under the Policy.

## B.  Threats of Criminal Prosecution

■ The Court next must determine the significance of Mr. Faracci's threat to bring criminal charges against Ms. Smith, if she refused to agree to a buyout and to sign the Release. The law in the State of Florida is clear: a threat of criminal prosecution does not constitute duress and will not justify

---

10. The following exchange in Ms. Smith's deposition is relevant:

> Q: "Now, in your conversation with Mr. Dauphinais, did you understand that the buyout of the policy, the settlement of the policy, would mean that you would be giving back the policy to Paul Revere and would have no further claims under it?
> A: Yeah, I guess I did at the time …

> Q: Did you understand that when you were receiving the $67,200, which represented four years of benefits, that you would be waiving any further rights that you had under the policy and that you would be asked to give the policy back?
> A: I understand that I would not be getting $1,400 a month from that point on."

rescission of a legal instrument, where the threat to seek prosecution is legally justifiable. *See Tyler,* 173 So. at 148–49; *Franklin,* 576 So.2d at 1372; *Scutti,* 220 So.2d at 630 (holding that there can be no duress unless the act of the party compelling obedience of another is unlawful or wrongful).

■ The legal consequences of filing a statement of claim with misleading information are set forth in Section 817.234 of the Florida Statutes Annotated.[11] Section 817.234, therefore, prohibits the filing of any statement of a claim with an insurance company which contains false or misleading information, and also requires that each claim form bear the following warning: "Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime." F.S.A. § 817 .234(b). The evidence here indicates that Ms. Smith continued to submit claim forms to Paul Revere with Dr. Cahn's signature several months after Dr. Cahn had stopped treating Ms. Smith.[12] Therefore, Mr. Faracci's threats of criminal prosecution were legally justified, and the same will not provide a basis to rescind the Release. *Id.*

## C. Totality of the Circumstances

■ While the evidence before the Court demonstrates that Ms. Smith's mental health, and Mr. Faracci's threats of criminal prosecution, separate and independently, will not justify rescission of the Release, the Court must determine whether all the circumstances in this case create a jury question as to whether Ms. Smith's will was overborne in this transaction. Although the Court finds no case law directly on point, and the parties do not cite any,[13] an examination of the following case law provides the Court with guidance on resolution of this issue.

The Florida Supreme Court has pursued two distinct lines in evaluating claims of duress and undue influence where the threat of criminal prosecution is used to compel a party to sign a legal instrument. The first line, characterized by *Burton* and *Sheldon v. Wilfore,* 136 Fla. 312, 186 So. 508 (1939), held that such a threat does constitute duress warranting rescission of a legal instrument. *Burton v. McMillan,* 52 Fla. 469, 42 So. 849 (1906); *Sheldon v. Wilfore,* 136 Fla. 312, 186 So. 508 (1939). The Supreme Court focused on three significant facts common to both cases: (1) the innocent signor in each was without knowledge of her spouses' criminal conduct, (2) the innocent signor had pledged her own property, and (3) the innocent signor was affected by poor health or mental weakness at the relevant time. *Burton,* 42 So. at 854; *Sheldon,* 186 So. at 509.

The second, ascendant line of cases is represented by *Tyler v. Hill Bros. Inc.,* 127 Fla. 419, 173 So. 147 (1937), *Norris v. Stewart,* 350 So.2d 31 (Fla. 1st DCA 1977),,and *Franklin v. Wallack,* 576 So.2d 1371 (Fla. 5th DCA 1991). In these cases, the Florida courts have held that a threat of criminal prosecution to compel the execution of a legal document does not constitute duress, as long as the threat was legally justifiable. *Tyler,* 173 So. at 150; *Norris,* 350 So.2d at 31; *Franklin,* 576 So.2d at 1372. Although the Florida Supreme Court last addressed this issue in *Sheldon,* the lower courts in Florida have

---

**11.** Florida Statute 817.234 provides in relevant part:

"Any person who, with the intent to injure, defraud, or deceive any insurer: 1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim ... commits a felony of the third degree."

**12.** Ms. Smith had continued to submit claim forms bearing Dr. Cahn's signature as late as March, 1993.

**13.** Defendant cites *Donnelly v. Mann,* 68 So.2d 584 (Fla.1953), *Pemelman v. Pemelman,* 186 So.2d 552 (Fla. 2nd DCA 1966), and *Feinberg v. Leach,* 243 F.2d 64 (5th Cir.1957), among others, in support of its position. These cases are inapposite. Although each involves an attempt to rescind a legal instrument on the basis of mental weakness, the court in each one concluded that the evidence was insufficient to sustain a finding that the complainant had been subject to coercion or undue influence. Similarly, the case cited by plaintiff, *Lane v. Talloni,* 626 So.2d 316 (Fla. 5th DCA 1993) is not applicable. In *Lane,* the Court remanded the case to the trial court to resolve conflicting testimony regarding the signor's competency. No such conflict exists here.

followed the reasoning in *Tyler*, denying claims of duress on these grounds and limiting *Burton* to its facts. A close examination of *Burton v. McMillan*, and *Tyler v. Bros.* and its progeny is instructive.

The Florida Supreme Court in *Burton*, and in *Sheldon v. Wilfore*, 186 So. 508 (1939) held that a threat of criminal prosecution to induce execution of a mortgage constituted duress and justified rescission of the legal instrument at issue. In *Burton* the employer accused Beverly Burton of embezzling certain funds and threatened to seek criminal prosecution unless Beverly, with his wife and daughter, conveyed certain property to the defendant employer to cover the shortage. Upon examination of all the relevant circumstances in the case, the Court held that Ms. Burton had acted under duress. The Court focused on Ms. Burton's poor health, on her lack of culpability in the her husband's criminal conduct, and on the fact that the property pledged to secure the losses was the wife's property.

In direct contrast to *Burton*, the Florida Supreme Court in *Tyler* enunciated the prevailing rule that absent the specific circumstances present in *Burton*, a threat of criminal prosecution to induce execution of a legal document did not justify rescission of the contract. After finding one of its employees, Grady Tyler, short in his accounts, Hills Bros., Inc. ("Hills Bros") threatened Grady with criminal charges of embezzlement unless Grady were able to produce funds to cover this shortage. Grady appealed to his brother H.D. Taylor for assistance. H.D. executed a note and mortgage in favor of Hill Bros in consideration for Hill Bros' assurances that it would bring no criminal charges against Grady. The Florida Supreme Court refused to rescind the contract, reasoning that there was no evidence that Hill Bros had "maliciously" threatened Grady of a crime or offense.

The *Sheldon* Court recognized the dichotomy in *Tyler* and *Burton*, and concluded that the facts of its case more closely matched those of *Burton* than of *Tyler*. In *Sheldon*, Irving Wilfore's employer discovered that

Mr. Wilfore was short in his accounts, and threatened him with prosecution if he would not mortgage his wife's property to the employer. Mr. Wilfore prevailed on his wife to mortgage her property in favor of the employer. In holding that Ms. Wilfore had signed the mortgage under duress, the Court found the following facts influential, (1) the property belonged to Ms. Wilfore, (2) she had no knowledge of her husband's embezzlement, and (3) she was sick with a "nervous disease" at the time she signed the mortgage. *Sheldon*, 186 So. at 509.

The modern trend, however, is to embrace *Tyler* and limit *Burton* and *Sheldon* to their facts, as demonstrated by *Franklin* and *Norris*. In *Franklin*, Mrs. Franklin's employer discovered that she had embezzled funds. *Franklin*, 576 So.2d at 1371. The employer threatened criminal prosecution unless Ms. Franklin executed a note and mortgage on the Franklins' home in favor of the employer. Although the trial court found that Mr. Franklin was not responsible for his wife's theft and did not know of it, *Franklin* concluded that the holding in *Tyler* controlled, and the Court, therefore, refused to rescind the mortgage. The Court distinguished *Burton* on two grounds, 1) the property at issue was not separate property owned by the innocent signor, and 2) there was no allegation of mental or emotion weakness. *See also Norris v. Stewart*, 350 So.2d 31 (Fla. 1st DCA 1977).

This Court concludes that the case at bar is more analogous to *Tyler, Franklin* and *Norris*, than to *Burton* and its progeny. Here, Paul Revere "threatened" Ms. Smith with criminal prosecution due to her own alleged criminal transgression. In *Burton* and *Sheldon*, the innocent signor was free of culpability in their spouses' criminal conduct. *Sheldon*, 186 So. at 509; *Burton*, 42 So. at 851. Although Ms. Smith's mental infirmity is well documented, unlike the innocent signors in *Burton* and *Sheldon*, she is the alleged culpable party. This Court, nevertheless, will examine all the circumstances as directed by *Burton* to determine whether rescission is warranted in this case.[14]

---

**14.** *Burton* provides in relevant part:
"On the contrary, another question is presented, and there is abundant authority that regard

should be had to the age, sex, and condition of the parties, and to the circumstances surrounding them at the time of making the con-

After examination of all the relevant facts and the unique circumstances in this matter, the Court concludes that defendant is entitled to summary judgment on plaintiff's claim for Declaratory Judgment. Plaintiff contends that Ms. Smith is chronically depressed, that she had low self esteem, was particularly susceptible to anxiety, could not deal effectively with stress, and that Paul Revere was aware of Ms. Smith's condition and took advantage of it.[15] In short, plaintiff contends that Ms. Smith's mental weakness coupled with the pressure exerted by Paul Revere create a jury question of whether Paul Revere unduly influenced Ms. Smith in her decision to sign the Release.

Although this Court is sympathetic to Ms. Smith's medical condition, the evidence indicates that Ms. Smith executed the Release with full knowledge of the consequences of doing so. First, the testimony from the plaintiff herself, and the reports and deposition testimony of Dr. Cahn and Dr. Berryer demonstrate that Ms. Smith had the capacity to understand the ramifications of accepting the lump sum payment. Also, Ms. Smith, not Paul Revere, first broached the possibility of a lump sum settlement of the Policy in October, 1992. Ms. Smith did not sign the Release until September 21, 1993, more than ten months after first raising the subject with Paul Revere. Ms. Smith, therefore, had ample time to consider settlement, and to seek counsel from Mr. Dinerstein and other, more knowledgeable sources on the prudence of signing the Release.

The Court further notes that Ms. Smith came to agreement on the final settlement payment with Mr. Dauphinais, not Mr. Faracci. Although Ms. Smith was motivated by the threat of criminal prosecution, according to her own testimony, Mr. Dauphinais treated her pleasantly over the course of their discussions and never threatened her in any way. Mr. Faracci's rudeness, and his threats of criminal prosecution also do not provide grounds for a finding of undue influence.[16] *Spillers v. Five Points Guaranty Bank*, 335 So.2d 851, 853 (Fla. 1st DCA 1976) (rudeness or lack of consideration is not sufficient to create a cause of action); *Franklin*, 576 So.2d at 1372.

Finally, the Court questions whether Ms. Smith can seek rescission of this settlement once she elected to ratify the settlement by accepting and spending the $67,200 lump-sum payout.[17] *Bardwell v. Albertson*, 120 Fla. 106, 162 So. 321 (1935). Ms. Smith used the $67,000 payout to satisfy outstanding debts and to purchase a home, which has since been foreclosed. "It is well settled that a remedy of rescission and cancellation does not hold high favor with the courts and even slight circumstances which indicate a purpose or intent upon the part of one seeking rescission to waive that right will prevent the granting of relief." *Bardwell*, 162 So. at 322. Accordingly, this Court concludes after examination of the relevant circumstances in this matter, that rescission of the Release is

tract, in order to determine whether undue influence was exercised, whether the act was voluntary or induced by duress, and, if the conditions existed showing that the parties were not dealing at arms length, that there was no equality of situation, and the judgment of one was overborne by sickness and apprehensions of disaster and disgrace, the maxim of 'In pari delicto' does not apply. Under the circumstances the question is simply one of undue influence."

15. Dr. Cahn testified that if Ms. Smith had been under his care at the time of this deal, he would have advised Ms. Smith to obtain counsel to advise her on the transaction. Dr. Berryer reported that Ms. Smith heard "whispering voices" in her mind when under stress. (Berryer Psychiatric Note, September 3, 1993).

16. Ms. Smith testified that Mr. Dinerstein was not present at her final meeting with Mr. Farac-

ci. The Court, therefore, does not find Mr. Dinerstein's testimony credible regarding Ms. Smith's second meeting with Mr. Faracci.

17. The *Bardwell* Court commented:

"One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity and effect of a contract; and, where one has an election to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and, having adopted one course with knowledge of the facts, he cannot afterwards pursue the other." *Bardwell*, 162 So. at 322 (quoting *Hendricks v. Stark*, 99 Fla. 277, 126 So. 293, 296 (1930)).

not warranted, and Paul Revere is entitled to summary judgment on this issue.

### D. SSI Rider

■ Plaintiff next asserts that Paul Revere failed to provide her with a copy of the SSI Rider, and, therefore, Paul Revere should not have reduced her monthly benefit when she qualified for Social Security. The SSI Rider entitles the beneficiary to an additional monthly benefit, until the occurrence of one of several events, one of which is the receipt of "Legislative benefits." [18] This caveat, however, appears in the SSI Rider itself, not in the main body of the Policy. The issue here, therefore, is whether plaintiff had sufficient notice of the SSI Rider. The Court concludes that, 1) plaintiff had adequate notice of the SSI Rider, even if she did not receive it, and 2) this claim is precluded in any case by the Court's finding that the Release is valid.

As a threshold matter, Ms. Smith's benefits are summarized in the "Policy Schedule," which she undisputedly received as it is part of the policy attached to her original complaint. The Policy Schedule is separated into two tables: the Table of Benefits and the Table of Additional Benefits. The Table of Benefits provides that the insured is entitled $1,400 from the 31st day of disability until the age of 65. It also provides for a $600 benefit from the 31st day until the 365th day of the policy. The Table of Additional Benefits states that "additional benefits are attached." Under the heading, Supplemental Social Insurance, the Table of Additional Benefits provides for a benefit of $600 per month beginning on the 366th day of disability.

Plaintiff contends that there exists a jury question on whether she received the SSI Rider. As evidence of this, plaintiff directs the Court's attention to the version of the Policy submitted by the defendant in support of its Motion for Summary Judgment. The front sheet of the Policy is signed by Aubrey K. Reed, as President, and yet, the SSI rider is also signed by Paul Revere's President,

this time by Charles E. Soule. Although the Court agrees with plaintiff that this inconsistency creates a question of the authenticity of the SSI Rider submitted by defendant, the inconsistency does not create a material question of fact for the below-stated reasons.

Review of the Policy Schedule indicates that Ms. Smith had notice of, and understood the consequence of her approval for Social Security Benefits. The Policy Schedule specifically provides that "additional benefits are attached." This put her on notice to examine the Policy. Ms. Smith's letter to Paul Revere, dated December 28, 1991, demonstrates that she had understood the significance of qualifying for Social Security benefits. Ms. Smith states she paid an additional premium of $79.86 "to receive the optional additional BENEFIT of $600 per month when not receiving Social Security or if receiving such benefit the difference between the benefit and the $600.00." Although Ms. Smith misunderstood the base level of benefits available under the Policy, which is also stated in the Policy Schedule, she did understand that an award of Social Security benefits would reduce her disability benefits under the Policy.

■ More important still, because the Court has upheld the validity of the Release, Ms. Smith is precluded from bringing this breach of contract claim regarding the SSI Rider. The Release, entitled "Release of all Claims," discharges Paul Revere from "all manner of actions, suits and demands which I ever had, now have, or may have against Said Company for or by reason of any matter, cause, or thing whatsoever, including but not limited to all liability arising from or pursuant to policy 01–02093347–002." The Release, therefore, precludes plaintiff's breach of contract claim.

Accordingly, it is

**ORDERED AND ADJUDGED** that defendants' Motion for Summary Judgment [DE 34] is GRANTED. It is further

---

**18.** The term "Legislated Benefits" is defined in the Policy as follows:

"Legislative Benefits means disability income benefits paid under Social Security and similar Federal, state, and local laws. This includes workers' compensation and occupational disease benefits."

**ORDERED AND ADJUDGED** that all pending motions in this matter, not addressed by this Order, are hereby MOOT. It is further

**ORDERED AND ADJUDGED** that the clerk of court is directed to CLOSE this case.