I would affirm the district court in this case because as a matter of law, Infinity did not act in bad faith. The insured's sole "evidence" of bad faith is Infinity's failure to meet Taylor's arbitrary deadlines for payment. Before Taylor's arbitrary deadlines expired, however, Infinity and Taylor verbally agreed to settle for the policy limits, but before his deadlines expired, Taylor did not obtain authority to execute a release as either the appointed personal representative for the estate or guardian of his child. This lack of authority to formally consummate the settlement made conclusion of the settlement impossible within Taylor's own arbitrary deadlines and does not demonstrate bad faith on Infinity's part. Had Infinity tendered payment before Taylor obtained the requisite settlement authority, the insured would not have been protected from further claims. Therefore, the evidence is insufficient as a matter of law to support the finding of bad faith.
 I. THE BAD FAITH STANDARD
Long ago, we explained an insurer's responsibilities in settling claims. In Boston Old Colony Insurance Co. v.Gutierrez, 386 So.2d 783, 785 (Fla. 1980), we stated that an "insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."Id. at 785 (emphasis added). To establish a breach of this duty, claimants must demonstrate more than mere negligence; they must prove the insurer acted in bad faith. Id. That is, the evidence must show that the insurer breached its fiduciary duty to the insured by "wrongfully refusing to settle the case within the policy limits, and exposing its insured to a judgment which exceeds the coverage provided by the policy." Dunn v.National Sec. Fire Cas. Co., 631 So.2d 1103, 1106 (Fla. 5th DCA 1993) (emphasis added).[13] Thus, the jury was instructed in this case as follows:
 An insurance company acts in bad faith in failing to settle the claim against its insured within its policy limits when under all the circumstances it could and should have done so had it acted fairly and honestly towards its insured and with due regard for his or her interest.
(Emphasis added.) See § 624.155, Fla. Stat. (1995) (defining statutory bad faith cause of action). Clearly mistakes and miscues do not meet this standard.
Because this standard requires the examination of the totality of the circumstances, the issue of bad faith ordinarily is one of fact for the jury. See Gutierrez, 386 So.2d at 785. As with many other issues that usually are questions of fact, however, the issue of bad faith may be determined as a matter of law when the facts are undisputed. Florida courts regularly uphold summary judgments when the undisputed facts demonstrate that the insurer could not have acted in bad faith. See, e.g., State Farm Fire Cas. Co. v. Zebrowski, 706 So.2d 275, 277 (Fla. 1997) (reinstating summary judgment in favor of insurer because the carrier has a duty to settle when it is in the insured's best interest, not when it is in the claimant's best interest); RLIIns. Co. v. Scottsdale *Page 688 Ins. Co., 691 So.2d 1095, 1096-97 (Fla. 4th DCA 1997) (affirming summary judgment for the insurer on the bad faith claim because it "at no time missed an opportunity to settle which would have put it in a bad faith posture"); Caldwell v.Allstate Ins. Co., 453 So.2d 1187 (Fla. 1st DCA 1984) (affirming summary judgment in favor of insurer on bad faith claim but reversing on other grounds).
This case, too, may be resolved as a matter of law because the undisputed facts viewed under the standard enunciated above demonstrate that Infinity could not have acted in bad faith. Infinity agreed to settle the case within Taylor's arbitrary deadline but could not, consistent with its obligations to the insured, tender payment of the settlement funds until Taylor could legally release the estate's and the minor's claims against the insured.
 II. THE FACTS OF THE CASE
Let us begin at the beginning. The accident occurred on March 29, 1990. Berges did not report the accident to Infinity. Therefore, Infinity first learned of it on April 23, when Taylor's attorney sent Infinity a claim letter. By April 30 — one week later — Infinity's investigation confirmed that its insured driver had been intoxicated and was at fault. On May 2, Taylor personally delivered his handwritten demand for the policy limits. Although Taylor demanded that payment be made for his daughter's claim by June 1 and for the estate's claim within twenty-five days, he also recognized that court proceedings might be necessary and pledged his cooperation in these processes. There is no evidence that Taylor's deadlines were tied to any particular event, and the record does not reveal why he established different deadlines for the claims.
Within another nine days, Infinity completed its investigation of the claim and outstanding coverage issues. On May 11 — well within Taylor's arbitrary deadlines of May 27 and June 1 — Infinity contacted him by telephone and agreed to settle for the policy limits, stating that Infinity would tender the money when Taylor obtained legal authority to sign releases as personal representative of the estate and guardianship of the minor child, with court approval of the settlement. See Erhardt v. Duff,729 So.2d 529, 530 (Fla. 4th DCA 1999) (holding that the insurer's conditioning its tender of policy limits on the injured party's executing releases was an acceptance, not a counteroffer, because releases were implicit in the agreement). Specifically, Infinity's representative (Fryer) told Taylor that Infinity was "willing to tender our policy limits on his wife and daughter, but that we need court approval on his daughter because of her age and copies of the probate papers on his wife naming him as executor of her estate to settle that portion [of the claim]." Taylor testified that this is exactly what he was told, and that he responded "yes" to the information. Taylor said he "assumed" Infinity "was fulfilling the obligation to the [demand] letter" and that what Infinity was doing was "fine" with him. Neither Taylor nor Fryer mentioned the deadline in Taylor's demand letter. Berges's brief in this Court concedes that "Infinity and Taylor both understood that court approvals were necessary."
Infinity offered to provide Taylor an attorney to handle the estate and guardianship matters at no cost. In fact, on May 16 — after Infinity and Taylor had orally agreed on a settlement — the insurer sent a letter to attorney Korth hiring him to do just that. The letter retaining Korth stated, in part, that he was hired "to arrange a court approved settlement on Christina Taylor for the amount of our policy limits of $10,000" and "the settlement of his deceased wife's bodily injury claim also for the amount of our policy limits of $10,000." *Page 689 
On May 24, Korth wrote Taylor confirming that he had begun work on the guardianship and that Infinity would tender payment of the policy limits as soon as Taylor was made personal representative and the court approved the minor's settlement. That same day, Korth wrote to Infinity confirming that he had written to Taylor and noting that when Taylor was appointed personal representative of his wife's estate, he would "immediately notify [Infinity] so that we can forward him a draft for that portion of the settlement." Because of a mistyped zip code on the envelope, however (one numeral was mistyped), the letter went astray. Neither Infinity nor Korth learned that the letter had been delayed. As a result, however, Taylor did not receive Korth's letter until nearly a month later. Nevertheless, that does not change the fact that Infinity and Taylor had orally agreed to settle for the policy limits. On July 11, Taylor, through his attorney (now re-hired), withdrew the settlement offer. At that time, Taylor still was neither the personal representative of the estate nor the legal guardian of his child for purposes of settlement.
 III. OF SETTLEMENTS AND SETTLEMENT AUTHORITY
Of course, oral settlement agreements, like other oral contracts, are valid and enforceable. See, e.g., United Statesv. Pepper's Steel Alloys, Inc., 289 F.3d 741, 742 (11th Cir. 2002) (referring to a prior case on appeal where the court found that the insurer's oral offer to settle for $2 million, accepted two years later, formed a valid settlement agreement); BankersSec. Ins. Co. v. Brady, 765 So.2d 870, 872-73 (Fla. 5th DCA 2000) (holding that an oral settlement agreement between the parties' representatives with settlement authority was binding);Long Term Mgmt., Inc. v. University Nursing Care Ctr., Inc.,704 So.2d 669, 673 (Fla. 1st DCA 1997) (holding that a verbal settlement agreement is enforceable); Boyko v. Ilardi,613 So.2d 103, 104 (Fla. 3d DCA 1993) (holding that "execution of settlement documents was not a condition precedent to the oral settlement agreement, but rather a procedural formality which both parties to the settlement agreement were obliged to perform"); see also Granicz v. Morse, 603 So.2d 103, 103 (Fla. 2d DCA 1992) (enforcing a verbal loan repayment agreement made by shareholders). Therefore, as soon as Taylor became the estate's personal representative and became his child's legal guardian and the court approved the settlement, Taylor could enforce Infinity's agreement to pay the policy limits.[14]
This, of course, is where the problem lies. Two obstacles remained to Taylor's ability to officially and legally settle the claims so that he could execute releases and Infinity could forward the agreed-upon payment of the policy limits. The first obstacle concerned administration of his wife's estate. Only the estate's personal representative has the authority to settle its claims. See Pearson v. DeLamerens, 656 So.2d 217, 220 (Fla. 3d DCA 1995) ("The personal representative is the individual having the power to enter into settlements of wrongful death actions"); § 731.201, Fla. Stat. (1989) (defining letters of administration as the "authority granted by the court to the personal representative to act on behalf of the estate of the decedent"); § 768.20, Fla. Stat. (1989) (providing that a wrongful death action "shall be brought by the decedent's personal representative, who shall recover for *Page 690 
the benefit of the decedent's survivors and estate"). On May 11, when Infinity agreed to pay the policy limits, Taylor had not yet become the estate's personal representative, which is why Infinity offered to assist in that endeavor.
The second obstacle was that his injured daughter was a minor. Therefore, under Florida law, because his daughter's claim exceeded $5000, Taylor could not officially settle it until a court appointed him the guardian and after a court determined that the settlement was in the minor's best interest. See §744.387(3), Fla. Stat. (1989) (requiring court approval for a guardian to collect a settlement or execute a release); Shea v.Global Travel Mktg., Inc., 870 So.2d 20, 24 (Fla. 4th DCA 2003) (recognizing that in Florida "statutory law prohibits a minor child's natural guardian from binding her to a settlement in excess of [the statutory amount] without the court's approval"),review granted, 873 So.2d 1223 (Fla. 2004); Sullivan v. Dep'tof Transp., 595 So.2d 219, 219 (Fla. 2d DCA 1992) (holding that no settlement of a minor's claim exceeding $5000 is effective without court approval); Orkin Exterminating Co. v. Lazarus,512 So.2d 1120, 1121 (Fla. 3d DCA 1987) (noting that where a judgment to a minor exceeds $5000, only a court-appointed guardian may execute a satisfaction of judgment). Taylor had not yet become his daughter's legal guardian for purposes of the settlement, and obviously had not obtained court approval.
These legal prerequisites never have been disputed. Taylor recognized them in his first demand letter; both Infinity and Taylor retained counsel to accomplish them; and at trial, Berges's expert admitted that until the court approved the settlement of the minor's claim and until Taylor posted bond and became the estate's personal representative, any release he signed was not legally effective. The trial court in this case instructed the jury that "[o]nly the Personal Representative of a deceased person is entitled to recover damages for the benefit of [the] decedent's survivors and estate" and that "no agreement as to settlement of claims exceeding five thousand dollars made on behalf of an injured minor or minor survivor in a wrong[ful] death action is binding or enforceable against the minors without court approval." The parties agreed this was the applicable law.
Thus, Taylor could legitimately offer to settle and Infinity could accept in principle. After all, Taylor was the decedent's husband and the natural guardian of the child. I agree that the district court erred in concluding otherwise. See Berges,806 So.2d at 508-09. The parties could not, however, consistent both with Florida law and with Infinity's obligations to the insured, officially consummate the settlement until the court papers were complete. See Nichols v. Hartford Ins. Co. of Midwest,834 So.2d 217, 220 (Fla. 1st DCA 2002) (concluding that an insurer's tendering of a check did not complete the settlement because the motorists' attorney was not authorized to cash the check until the terms of release were agreed to; therefore, no settlement agreement existed), review denied, 845 So.2d 890 (2003);Erhardt, 729 So.2d at 529-30 (holding that execution of releases is an implicit condition of settlement); Auerbach v.McKinney, 549 So.2d 1022, 1029, 1031 (Fla. 3d DCA 1989) (holding that payments made in settlement of a minor's claim where no guardian had been appointed and no court approval was given were unauthorized and violated state law). The district court was correct, therefore, insofar as it concluded that Taylor lacked the capacity to conclude the settlement within the relevant time frame. See 806 So.2d at 509. *Page 691 
Despite the fact that Taylor and Infinity had orally agreed to settle for the policy limits as soon as the legal requirements were accomplished, on June 11, Taylor, through counsel, unilaterally revoked the offer solely because Infinity did notdeliver payment within his arbitrary deadlines (because of the mistyped zip code, Taylor had not received Korth's May 24 letter by that time). Taylor withdrew the offer even though the two conditions both parties recognized were necessary to payment of the settlement proceeds had not been fulfilled. First, Taylor was not yet the authorized personal representative of the estate. Infinity had inquired whether Taylor's attorney was continuing to handle the personal representative matter for Taylor, but the attorney's office would not say. Although Taylor wasconditionally appointed personal representative on May 14, he did not inform Infinity of this fact (nor did his attorney, who apparently was continuing to handle the estate). Moreover, he had not yet posted the bond the court had required for issuance of the letters of administration. (He did not do so until June 20 — the same date he received Korth's misdirected letter — after which he filed suit against Infinity.) Neither had the guardianship and court approval of the minor's settlement yet been obtained. In fact, the day after revoking the offer, Taylor's attorney instructed Korth to discontinue work on the guardianship proceedings and thus eliminated any possibility of concluding settlement of the minor's claim.
Thus, Taylor did not have authority either on behalf of the estate or on behalf of his minor daughter at any time before he revoked his offer, and he did not obtain the requisite letters of administration for the estate until about the time he filed suit.[15] In fact, in the tort litigation against the insured, Taylor successfully contended that "as a matter of law . . . there was no settlement between Taylor and Infinity because Taylor lacked the necessary authority to sign the required releases." 806 So.2d at 507. The trial court granted Taylor summary judgment on Infinity's affirmative defense of settlement.Id. Given that Taylor never obtained the authority to legally execute the settlement within his arbitrary deadlines of 25 and 30 days after his initial demand letter, Infinity could not have been acting in bad faith by not forwarding payment at that time.
Berges contends that Infinity either had to tender the money to Taylor by Taylor's arbitrary deadlines or segregate the funds in an interest-bearing account. Even had Infinity placed the money in such accounts, however, Taylor would have been no closer to obtaining it and concluding the settlement than he already was, as he could not recover the funds until his appointments as guardian and personal representative were complete. A bad faith claim concerns the insurer's failure to effect a settlement, and Infinity's failure to meet any of Taylor's terms that did not lead to or advance the parties to settlement are irrelevant. The pivotal legal fact remains that had Infinity actually delivered the policy proceeds to Taylor before he was authorized to execute the necessary releases, Infinity could have exposed Berges, as the insured, to additional claims. See Sullivan v. Dep't ofTransp., 595 So.2d 219 (Fla. 2d DCA 1992) (holding that a previous settlement agreement involving a minor did not bar a subsequent *Page 692 
wrongful death claim because the court had not approved the settlement); Erhardt, 729 So.2d at 530 (holding that an insurer's requirement that an injured party execute releases was implicit in the settlement and stating, "it would have made no sense for [the insurer] to tender its policy limits if there remained a possibility that it could still be liable for further claims by Erhardt arising from the same incident"). As the district court stated: "Given the insurer's duty to protect its insured in settlement negotiations, the insurer has no obligation to settle unless the settlement offer would protect its insured."806 So.2d at 508. The duty of good faith was owed to Berges, not to Taylor. Taylor's demand letter recognized that before he could receive payment under a settlement, he needed to obtain legal authority. Because Taylor lacked authority to settle before he withdrew his offer, however, Infinity did not have a reasonable opportunity to conclude the settlement. The majority places the insurer in an untenable position: it finds bad faith because the insurer did not forward payment to Taylor when he was not yet legally authorized to execute a release; and yet, had Infinity done so, it could have been exposed to a bad faith claim.
 IV. SETTLEMENT DEADLINES AND BAD FAITH
Taylor's demand letter required Infinity to tender payment on the bodily injury claims within his designated time limits; "[o]therwise there [wa]s no deal." I understand that it is common practice for a party contemplating litigation to submit a settlement offer that remains outstanding for only a finite period and that a person injured by a policyholder may set any deadlines he desires — even an arbitrary or unreasonable one. An insurer does not act in bad faith, however, when it fails to meet an arbitrary deadline. See DeLaune v. Liberty Mut. Ins. Co.,314 So.2d 601, 603 (Fla. 4th DCA 1975) (affirming a verdict for the insurer on a bad faith claim where the insurer missed by one business day the claimant's "totally unreasonable" ten-day offer acceptance deadline, which was the sole basis for the bad faith claim); see also Southern Gen. Ins. Co. v. Holt, 262 Ga. 267,416 S.E.2d 274, 276 (1992) ("An insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney."). For example, in Clauss v. Fortune Insurance Co., 523 So.2d 1177
(Fla. 5th DCA 1988), the insurer expressed its intent to accept the injured party's settlement offer upon its verification of the claim. The day after the injured party's thirty-day deadline passed, the insurer sent a letter to his attorney tendering the policy limits and including a release form. The injured party, however, refused to settle. The district court concluded that "[a] one-month period to verify the claim was not excessive, and certainly does not rise to the level of bad faith, particularly when Fortune tendered the policy limits one day after the notice of the bad-faith failure to settle was sent by Clauss." Id. at 1178. Thus, the insurer "did not violate either its common law duty of good faith or its statutory duty of good faith." Id. at 1179.
Berges's claims of "evidence" of bad faith are all in reality claims that Infinity did not meet Taylor's deadlines. I have already explained why Infinity could not deliver payment within the deadlines. Berges therefore claims that the bad faith lies in Infinity's failure to obtain for Taylor the requisite legal authority for completing the settlement within his deadlines.
Let's look at the facts.
Within eighteen days after learning of the accident, Infinity had investigated the claim and accepted Taylor's May 2 offer to settle, conditioning its acceptance on the *Page 693 
legal proceedings Taylor understood were necessary for settlement. Within a week, although it had no duty to do so, Infinity hired an attorney (Korth) on Taylor's behalf at its own expense to undertake the necessary legal proceedings. It sent him a letter containing the relevant details. Korth commenced work on the case, and on May 23 sent Taylor a letter explaining the process to him. Neither Infinity nor Korth had any reason to believe that Taylor did not soon thereafter receive the letter. In fact, when Taylor revoked his offer, Infinity and Korth contacted Taylor's attorney, sending him copies of the pleadings Korth had drafted to demonstrate that the matter was being worked on and that tender of payment would be forthcoming.
The majority concludes that "the dissent ignores the evidence that suggests that the failure to consummate the settlement was due to Infinity's own actions in . . . not working diligently to obtain the court approvals." Majority op. at 678 n. 9. To the contrary, there is no evidence that Infinity was not pursuing the legal process necessary to conclude the settlement.
Berges claims that Infinity should have worked faster to meet the deadlines or called Taylor to ask for an extension for tendering payment, and that these factors evidence bad faith.[16] Testimony at trial, however, showed that in the May 11 conversation in which Infinity accepted Taylor's offer, the deadlines were not even mentioned. Subsequently, Taylor continued to believe the deadlines were in force. Infinity's claims agent believed they were no longer in effect, but Infinity would try to meet them. Based on this testimony, the majority concludes that the issue of the deadlines' continued effect requires a jury determination. Majority op. at 678 n. 9. This conclusion misses the point. Whether the deadlines were still in effect is irrelevant because the fact that Infinity missed these deadlines cannot establish bad faith.
Here, the undisputed evidence shows that Infinity accepted
the offer to settle for the policy limits within Taylor's arbitrary deadline; it just could not forward actual payment until Taylor had the legal authority to execute releases on behalf of the estate and guardianship. Infinity cannot be held to have acted in bad faith for failing to accomplish the many tasks necessary to complete the settlement — investigate the claim, negotiate with Taylor, obtain legal documents for the estate, obtain legal documents for the guardianship, request and obtain court approval of the settlement — all within Taylor's arbitrary twenty-five- and thirty-day deadlines. Even if evidence had been presented that Infinity could have accomplished all these tasks in such a short time, that alone does not prove that Infinity's failure to do so was even negligent, much less bad faith — that is, that Infinity failed to settle the claim against its insured within the policy limits "when, under all the circumstances, it could and should have done so had it acted fairly and honestly towards its insured and with due regard for his interests." This is the standard the jury was instructed to apply, and it was Berges's burden to show that Infinity acted "wrongfully," i.e., unfairly or unreasonably. In fact, even Taylor, who retained his own *Page 694 
counsel to establish the estate, did not accomplish this task within his own deadlines. There is simply not a scintilla of evidence that Infinity's failure to meet the time demand by actually delivering payment constituted bad faith disregard for the insured's interests. See Powell v. Prudential Prop. Cas.Ins. Co., 584 So.2d 12, 14 (Fla. 3d DCA 1991) (holding that "[b]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause") (emphasis added).[17]
 V. CONCLUSION
As noted above, a plaintiff cannot demonstrate bad faith merely by proving mere negligence or mistake. As in this case, in Paviav. State Farm Mutual Automobile Insurance Co., 82 N.Y.2d 445,605 N.Y.S.2d 208, 626 N.E.2d 24, 28-29 (1993), the insurer failed to meet the claimant's arbitrary deadline and did not ask for an extension of time. The court held as a matter of law that the plaintiff failed to establish a prima facie case of bad faith because the evidence demonstrated no more than ordinary negligence. Acknowledging that the insurer did not ask for a time extension, the court stated that this failure at best amounted to "mistaken judgment or administrative delay in confirming what [the insurer] had suspected it would do all along — settle for the policy limits." Id. at 29. In so holding the court emphasized its concern that
 [p]ermitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith inquiry would promote the customary manufacturing of bad-faith claims, especially in cases where an insured of meager means is covered by a policy of insurance which could finance only a fraction of the damages in a serious personal injury case. Indeed, insurers would be bombarded with settlement offers imposing arbitrary deadlines and would be encouraged to prematurely settle their insureds' claims at the earliest possible opportunity in contravention of their contractual right and obligation of thorough investigation.
Id. at 28-29.
For these reasons, I respectfully dissent.
WELLS and BELL, JJ., concur.
[13] "Wrongful" means "[c]haracterized by unfairness or injustice." Black's Law Dictionary 1606 (7th ed. 1999).
[14] Whether these facts constitute an enforceable settlement is ultimately irrelevant, however, because it is readily apparent that Infinity agreed to settle and merely insisted on Taylor having authority to release the insured before tendering the check.
[15] The petitioner argues that Taylor had such authority because section 768.20, Florida Statutes, allowed Taylor's capacity as personal representative, obtained on June 20, to "relate back" and validate his settlement offer. I agree that, had Taylor not revoked his offer, his appointment would relate back to the oral settlement agreement and make it enforceable. But because Taylor revoked the offer before obtaining such authority, there was no settlement offer to which the authority could relate back.
[16] Berges's civil litigation expert testified that if the insurer had filed a "friendly suit," the process could have been completed within the time frame, or if it could not, the insurer could have placed the money in escrow accounts. The expert admitted, however, that Taylor's own attorney had testified that the process would take more than thirty days. He also admitted that no release Taylor signed would be legally effective until the court approved the minor's settlement and Taylor posted bond to become the personal representative.
[17] It is true that Infinity did not inform the insured of Taylor's offer. This fact alone, however, without any other evidence of alleged bad faith, is simply insufficient to support a finding of bad faith. See Koppie v. Allied Mut. Ins. Co.,210 N.W.2d 844, 848 (Iowa. 1973) (holding that where only evidence of alleged bad faith was failure to inform the insured, no jury issue was presented); cf., Shuster v. S. Broward Hosp. Dist.Physicians' Prof'l Liab. Ins. Trust, 591 So.2d 174, 177 (Fla. 1992) (holding no bad faith where insurer settled within policy limits). Taylor demanded the policy limits, and Infinity agreed to pay the policy limits, which meant the insured would not be exposed to an excess claim. Further, no evidence showed that Infinity delayed in attempting to conclude the settlement. SeeHiggs v. Indus. Fire Cas. Ins. Co., 501 So.2d 644 (Fla. 3d DCA 1986), review denied, 511 So.2d 298 (Fla. 1987) (reversing for new trial on bad faith claim where the claimant alleged that the insurer agreed to a settlement and then delayed payment). Had Infinity told Berges of its acceptance of the offer and he decided instead to offer funds from his own resources within the limited time frame, he would have confronted the same problem that Infinity did: Taylor lacked the authority to release him. *Page 695