704 So.2d 669 (1997)
LONG TERM MANAGEMENT, INC., Appellant,
v.
UNIVERSITY NURSING CARE CENTER, INC., Appellee.
No. 96-2616.
District Court of Appeal of Florida, First District.
December 12, 1997.
*670 Louis L. Long, Jr. of Butler & Long, Tallahassee, for Appellant.
Keith E. Hope of Keith Hope, P.A., Key Biscayne, for Appellee.
JOANOS, Judge.
Appellant, Long Term Management, Inc. (LTM), appeals an order of the trial court enforcing a settlement purportedly reached between LTM and University Nursing Care Center, Inc. (UNCC). The issues presented are: (1) whether the trial court's finding of a valid and enforceable settlement is supported by competent substantial evidence; (2) whether the trial court possessed subject matter jurisdiction to enforce a settlement; *671 and (3) whether the appointment of the substitute judge was invalid, thus voiding the enforcement order. We affirm in part and reverse in part.
LTM is a management company which was engaged to manage the day-to-day operation of UNCC. UNCC is a skilled nursing facility which derives ninety-eight percent of its revenue from public funding under the Medicare and Medicaid programs. Anthony Liuzzo is the sole shareholder of UNCC, and controls its activities. On September 19, 1994, LTM and UNCC entered into a management agreement, ostensibly to protect UNCC from state and federal regulators by assuring that Liuzzo had divested himself from the operation of the nursing home.[1]
On March 21, 1996, LTM filed a verified complaint against UNCC and Anthony Liuzzo, seeking declaratory and injunctive relief, and damages. According to the allegations of LTM's complaint, the management agreement entered into by the parties provided for automatic termination of the agreement upon the sale, lease or transfer of the nursing home, subject to a right of first refusal granted to LTM under section 6.01 of the agreement. When the parties entered into the agreement, UNCC was a debtor-in-possession in a Chapter 11 proceeding. The Bankruptcy Court ruled the management agreement, including its right of first refusal, was properly entered into by UNCC and was an enforceable and binding contract. In an order dated March 4, 1996, the Bankruptcy Court confirmed UNCC's fourth amended plan of reorganization, effectively concluding the UNCC Chapter 11 case. The court stated that LTM should pursue any contract claims it had against UNCC in state court. The LTM complaint further alleged that Liuzzo repeatedly advised LTM and others that he intended to get rid of LTM as soon as he concluded a lease agreement or stock sale with a third party, and did not intend to honor LTM's acknowledged right of first refusal. Paragraph 18 of the complaint provides:
18. In order to wrongfully deny LTM its legal right to have and possibly elect to exercise its right of first refusal should UNCC enter into a bona fide lease transaction or stock sale with Preferred Care, Inc. or any other third party, UNCC and Liuzzo have contrived a pretextual or "bogus" termination of the Plaintiff's Management Agreement under § 2.02 thereof.
On March 21, 1996, the trial court issued a temporary injunction, enjoining UNCC from: terminating the management agreement; changing the signatories on any bank accounts held in UNCC's name at First Union National Bank; seizing mail, checks, cash receipts or books and records of UNCC; and taking any other action having the purpose or effect of harassing, interfering with, or impeding LTM in the performance of the day-to-day operations of the nursing home. The injunction was intended to preserve the status quo until the respective rights, duties, and obligations of the parties were finally determined upon further order of the court.
Thereafter, UNCC and Liuzzo filed separate motions to dissolve the injunction. Liuzzo alleged the temporary injunction and the lawsuit were in violation of an order of the Bankruptcy Court. On April 11, 1996, the trial court entered an order terminating the temporary injunction. The court found LTM's possible loss of its right of first refusal could be compensated by monetary damages, and the threatened injury to LTM did not outweigh the possible harm to UNCC "in that the Defendants are under an absolute need to sell or lease the premises to some third party."
On April 12, 1996, UNCC filed a motion to dismiss the verified complaint. On May 17, 1996, UNCC filed a verified emergency motion to enjoin plaintiff LTM from removing or destroying books and records. The emergency motion for injunction stated, among other things, that on May 17, 1996, UNCC removed LTM and its personnel from the nursing home and totally terminated its contractual relationship with LTM. UNCC replaced LTM with Enterprise Health Management, Inc., "and physically took control of the Nursing Home, as well as the health care responsibilities of the patients." UNCC sought an injunction to prevent LTM "from *672 removing, altering or destroying any and all books and records, including without limitation, any and all electronic data contained in computer systems located at Gainesville, Florida and New York City."
On May 23, 1996, the trial court entered an order granting First Union Bank's motion to intervene, and granting temporary injunctive relief as to funds on deposit by LTM for UNCC. UNCC then filed a motion for temporary injunction requiring LTM to deliver to UNCC the balance of funds paid to UNCC during April and May 1996 for the use and benefit of residents of the facility. The motion alleged that LTM had diverted and held funds paid to it by agencies of the state and federal governments, which funds UNCC required for operation of its facility.
Immediately before the May 28, 1996, hearing on the motions for injunction, the parties conferred outside the courtroom. When called to the courtroom, counsel for UNCC advised the trial court that the parties had reached a settlement, "subject to writing it down." LTM's counsel stated that LTM had turned over all of the books and records belonging to UNCC, and would retain computer software and hardware with "hard copy paper records" of that material to be provided to UNCC. Counsel further stated that from September 1995 through March 1996, LTM was entitled to a six percent management fee. Pursuant to the settlement, LTM would retain a three percent management fee for April and May from the money it then held in the nursing home accounts. LTM's counsel advised the trial court that the parties would exchange general releases, "identical in language and reciprocal." UNCC's counsel then told LTM's counsel to take the first "run through on the agreement," and get it to him.
Two days later, on May 30, 1996, UNCC filed a motion to enforce settlement. The motion alleged that the transcript of May 28, 1996, was enforceable and that "[e]xecution of a settlement document was not made a condition precedent to the settlement on the record but rather is a mere procedural formality which both parties are obliged to perform." UNCC sought an order enforcing the settlement and ordering First Union Bank to transfer from frozen accounts all funds held by the bank, except those necessary to pay the three percent management fee for April and May 1996.
At the hearing on the motion to enforce settlement and to release funds, UNCC's counsel argued it was clear the court was free to enforce all of the terms of the settlement as recited in UNCC's proposed order. LTM's counsel responded that the parties announced they had reached a settlement, subject to reducing the settlement to written form. LTM's counsel stated that as a courtesy, the parties informed the court of the settlement, but maintained that not all of the terms and conditions of the settlement were included in the oral announcement. LTM's counsel further advised there was an unresolved item concerning $150,000 which was still in dispute. It was LTM's position that the $150,000 would be assigned to LTM, with the right to try to collect the funds in return for LTM's voluntary reduction of the management fee from six percent to three percent, and for its voluntary relinquishment of the remaining term of the management contract.
UNCC's position was that the $150,000 would be treated as funds already received by LTM. According to UNCC's counsel, the $150,000 was not mentioned in the courtroom, because prior to entering the courtroom, the parties agreed the $150,000 was part of management fees.
The trial court advised that the court was willing to receive testimony as to the $150,000 in dispute. However, the court refused to sign a proposed order denying enforcement of the settlement. The court was of the view that there was a possibility a settlement could be reached. LTM's counsel then filed a motion requesting the presiding judge to disqualify himself. The proceedings were recessed to permit the judge to review the motion. When the presiding judge returned to the courtroom, he presented a substitute judge, and advised the proceedings would be conducted by the substitute judge.
The substitute judge received testimony from the presidents of LTM and UNCC, concerning their respective positions as to *673 the disputed $150,000, as well as the other terms of the proposed settlement. At the conclusion of the hearing, the judge observed that he had a great deal to assimilate. The substitute judge found the issues for resolution were whether there was a mutual mistake in the parties' oral presentation of the agreement to the court; whether LTM's counsel was authorized to make a settlement which could bind LTM to the oral announcement of the settlement; and whether there was a meeting of the minds as to the $150,000, which the court found to be a material part of the agreement.
Four days later, the substitute judge entered the subject order enforcing the settlement. The court found the transcript of the settlement hearing revealed that LTM's president was present when the settlement was announced, and was an active participant in the proceedings. The court further found the testimony of UNCC's president confirmed that the agreement he made was the agreement dictated into the record on May 28, 1996, and the transcript demonstrates there was a meeting of the mindseven though at the June 5, 1996, hearing, LTM's president said he meant something different than the transcript demonstrated. Based on these findings, the court ordered LTM to turn over all books and records to UNCC; granted authority to First Union Bank to make specific disbursements, including transfer of monies held in all accounts at First Union Bank still subject to the injunction; ordered LTM to transfer immediately to UNCC all UNCC funds held by LTM; and ordered LTM and its president to execute and deliver general releases, releasing UNCC and Anthony Liuzzo from all claims arising out of the business relationship which is the subject of this litigation.
LTM's first issue is directed to the trial court's finding of a valid and enforceable settlement. Settlements are highly favored as a means to conserve judicial resources, and will be enforced when it is possible to do so. Murchison v. Grand Cypress Hotel Corp., 13 F.3d 1483, 1486 (11th Cir.1994); Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla.1985); Healey v. Healey, 658 So.2d 1096, 1098 (Fla. 1st DCA 1995). Settlements are construed in accordance with the rules for interpretation of contracts. Robbie, 469 So.2d at 1385; Williams v. Ingram, 605 So.2d 890, 893 (Fla. 1st DCA 1992).
"[A]n oral agreement reached by the parties and announced to the trial court is a fully enforceable settlement agreement." Dowie v. Dowie, 668 So.2d 290, 292 (Fla. 1st DCA 1996); Roskind v. Roskind, 552 So.2d 1155, 1156 (Fla. 3d DCA 1989) ("A stipulation properly entered into the record, where there is a clear understanding of the finality of that agreement, is an effective and enforceable settlement notwithstanding that it is subject to reduction to a written document."); Silva v. Silva, 467 So.2d 1065 (Fla. 3d DCA 1985). To be judicially enforceable, a settlement agreement "must be sufficiently specific and mutually agreeable as to every essential element." Williams v. Ingram, 605 So.2d at 893; Gaines v. Nortrust Realty Management, Inc., 422 So.2d 1037, 1039-1040 (Fla. 3d DCA 1982).
The party seeking a judgment on the basis of a settlement has the burden to establish a meeting of the minds or mutual reciprocal assent to a certain and definite proposition. Williams v. Ingram, 605 So.2d at 893. A trial court's finding of a meeting of the minds must be supported by competent substantial evidence. Healey, 658 So.2d at 1099.
In Murchison, the 11th Circuit concluded that Murchison's discussions with his attorney during settlement negotiations, and his presence in the courtroom when the settlement was announced on the record, indicated his attorney clearly had authority to engage in settlement negotiations. 13 F.3d at 1485-1486. The court noted that Murchison knew his lawyer was in the process of negotiating a settlement, and met with his attorney on at least three occasions to discuss progress of the negotiations. When the settlement agreement was read in open court, Murchison did not object, either to his attorney or to the court. The court rejected Murchison's argument that his silence should not be taken as approval, noting:
Dr. Murchison is an educated man who understood the terms of the settlement *674 agreement. If he was unhappy with the settlement agreement, then he should have objected at the time that it was read into open court.
13 F.3d at 1486.
We consider the circumstances of the settlement in this case distinguish it from the situation described and ruled upon by the federal court in Murchison. It is undisputed in this case that the parties met at the courtroom door ten minutes before a scheduled hearing on UNCC's motions for release of funds. When the parties and attorneys were advised that the judge was ready for them, UNCC's counsel advised the court that the parties had reached a settlement. Despite the "settlement" characterization, the May 28, 1996, transcript indicates, among other things, that the parties intended the agreement would not be binding until reduced to writing and properly executed. This is revealed by the following excerpts from the transcript:
[UNCC's counsel]: It's a settlement subject to writing it down, which we expect to do today, ...
[LTM's counsel]: ... We're going to try to write this up. We're going to go back and try to do it this morning. As soon as it's written up and signed, ... at that point we'll transfer the funds minus the 3 percent management fee for the two months. (Emphasis supplied).
....
[UNCC's counsel]: I understand that's what you're saying but I don't want the agreement to be account specific.
....
[LTM's counsel]: That's fine. We have no problem saying that. We'll represent that those are the two accounts but we will say in general terms that any money that belongs to UNCC in the possession of LTM goes to you.
....
[LTM's counsel]: ... And I'll mention the two accounts but I will say that we're not limiting it to those.
....
[UNCC's counsel]: And the agreement ought to say that uponJim, how will we address
[Bank's counsel]: The agreement's got to authorize the bank to release the funds from those accounts.
[UNCC's counsel]: Correct. That's where I was going. The agreement's got to authorize release of the parties.
[LTM's counsel]: We'll do that. That will be upon its full execution. (Emphasis supplied).
[UNCC's counsel]: You take the first run through on the agreement, get it to me....
These comments establish that the parties contemplated that an initial draft would be prepared by one attorney, then submitted to opposing counsel for review and possible amendment. The transcript further reflects the parties' recognition that a written agreement was a prerequisite to release of funds held by the Bank. These circumstances are not consistent with a determination that the parties had a clear understanding that the agreement was final and enforceable on the abbreviated terms recited to the trial court.
As the moving party, it was UNCC's burden to establish clearly and unequivocally that LTM's counsel was authorized to settle LTM's cause of action. It appears UNCC failed to make the required showing. The hearing transcript reveals the attempts made by LTM's president to clarify the status of the First Union accounts on which he was signatory. This testimony constitutes objective evidence that LTM's attorney lacked knowledge concerning the ownership of the contested accounts. It follows that counsel was unable to negotiate a binding agreement for LTM involving a matter which was of primary significance to UNCC. We conclude the failure of LTM's president to object to the terms recited by counsel was consistent with his June 5, 1996, testimony that he viewed the announcement of terms as a general summary of the parties' negotiations presented to the court as a courtesy, rather than as a stipulation.
As the moving party, UNCC was required to demonstrate a meeting of the minds concerning *675 allocation of the disputed $150,000. In view of LTM's reduction of its management fee from six percent to three percent, and its relinquishment of its rights under the remaining four months of the contract, it does not appear the parties' silence concerning the $150,000 constitutes objective evidence of their mutual intent to treat the $150,000 as a credit toward fees owed to LTM. The unrebutted testimony of LTM's president established that the $150,000 was discussed outside the courtroom on May 28th, but was omitted in the recital of terms before the trial court. The parties' differences concerning the allocation of the $150,000 became apparent when LTM's counsel sent the draft of a written agreement to UNCC's counsel.[2] At that point, UNCC's counsel called with objections to an indemnification clause and LTM's treatment of the $150,000. These circumstances do not show the requisite meeting of the minds concerning the contested $150,000.
Similarly, as the moving party, it was incumbent upon UNCC to demonstrate mutual assent concerning the question of releases. The only objective evidence on this issue consists of the parties' silence when LTM's counsel stated the parties would exchange general, identical releases. The parties' silence as to this issue is insufficient to demonstrate mutual assent. See Miami Herald Publishing Co. v. Payne, 358 So.2d 541, 542-543, n. 5 (Fla.1978).
In short, we are not persuaded that UNCC established a mutual assent or meeting of the minds with respect to (1) the allocation of the $150,000 allegedly embezzled by the LTM employee; (2) the binding nature of the agreement prior to its execution in written form; or (3) the nature of the releases to be exchanged.
With regard to the second issue, LTM contends the complaint was limited to causes of action for declaratory and injunctive relief, which causes were mooted on May 18, 1996, when UNCC terminated the management agreement. LTM reasons that the trial court did not have jurisdiction to adjudicate or to enforce the matters addressed in its order, because these matters were not framed by the pleadings, LTM did not amend the complaint to add a breach of contract claim for nonpayment of fees or damages, and UNCC did not file an answer or counterclaim raising the claims disposed of by the contested settlement agreement. As support, LTM cites Cortina v. Cortina, 98 So.2d 334, 337 (Fla.1957), for the proposition that "[i]t is fundamental that a judgment upon a matter entirely outside of the issues made by the pleadings cannot stand; and where, as here, an issue was not presented by the pleadings nor litigated by the parties during the hearing on the pleadings as made, a decree adjudicating such issue is, at least, voidable on appeal." See also Wallace v. Townsell, 471 So.2d 662, 665 (Fla. 5th DCA 1985).
UNCC relies upon Naghtin v. Jones, 680 So.2d 573 (Fla. 1st DCA 1996), review denied, 691 So.2d 1080 (Fla.1997), for the proposition that the trial court had continuing jurisdiction to enforce a settlement agreement in any case still pending before it. In Naghtin v. Jones, this court explained:
Even when not incorporated in a court order, a stipulation in writing subscribed by the parties and their counsel, which is designed to obviate or delimit litigation, can and should be enforced by the judge before whom the case is pending. To the extent it was necessary to construe the parties' written settlement agreement in doing so, the trial court acted well within its jurisdiction.
680 So.2d at 576. See also Sun Microsystems of California, Inc. v. Engineering & Mfg. Systems, C.A., 682 So.2d 219, 221 (Fla. 3d DCA 1996) ("A trial court has the inherent authority and jurisdiction to enforce court-approved settlement agreements").
LTM's verified complaint includes a count seeking damages based generally on the conduct alleged in support of the claims for declaratory judgment and injunction, which *676 conduct also related to the allegations in UNCC's motions for injunction. Since these matters were pending when the parties engaged in settlement negotiations, it appears the trial court had jurisdiction to enter the order enforcing settlement.
LTM's final point challenges the validity of the appointment of the substitute judge who entered the order here under attack. The statute governing disqualification of a judge for prejudice, section 38.10, Florida Statutes, states in part:
Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in favor of the adverse party, the judge shall proceed no further, but another judge shall be designated in the manner prescribed by the laws of this state for the substitution of judges for the trial of causes in which the presiding judge is disqualified....
The related rule, Florida Rule of Judicial Administration 2.160, provides in part:
(f) DeterminationInitial Motion. The judge against whom an initial motion to disqualify under subdivision (d)(1) is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged. If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action....
The designation of a judge to hear a cause when an order of disqualification has been entered is governed by section 38.09, Florida Statutes, which provides:
Every judge of this state shall advise the chief judge of the circuit upon the entry of an order of disqualification. An order of assignment shall then be entered as provided by the Florida Rules of Judicial Administration. In the event any judge is disqualified as herein provided, upon application for any temporary writ of injunction or habeas corpus, the judge shall immediately enter an order of disqualification, whereupon the cause may be presented to any other judge of a court of the same jurisdiction as the court in which that cause is pending; and it shall be the duty of any such judge to hear and determine such matters until a substitute judge is so designated.
The applicable rule, Florida Rule of Judicial Administration 2.050, provides in part:
(4) ... If a judge is ... disqualified in an action, ... the chief judge or the chief judge's designee may assign a proceeding pending before the judge to any other judge or any additional assigned judge of the same court....
A motion for recusal is considered untimely if it is not filed until after the moving party has suffered an adverse ruling, unless good cause is shown for the delay. Fischer v. Knuck, 497 So.2d 240, 243 (Fla. 1986). "[O]nce a trial judge has recused himself, further orders of the recused judge are void and have no effect." Bolt v. Smith, 594 So.2d 864 (Fla. 5th DCA 1992). However, "[w]hen a judge has heard the testimony and arguments and rendered an oral ruling in a proceeding, the judge retains the authority to perform the ministerial act of reducing that ruling to writing." Fischer v. Knuck, 497 So.2d at 243.
The record shows the order of recusal and designation of substitute judge occurred in the following manner:
On June 6, 1996, LTM's counsel filed a motion for recusal. The original judge immediately recessed the proceedings to review the motion. When he returned, he presented the substitute judge, orally recused himself, and left the courtroom. The substitute judge assumed authority for that day's proceedings.
On June 10, 1996, the substitute judge entered the order enforcing settlement.
On June 18, 1996, the original judge was appointed acting chief judge from June 20, 1996, through June 26, 1996.
On June 21, 1996, the original judge entered a written recusal order.
On June 24, 1996, in his capacity as acting chief judge, the original judge issued an order transferring the cause from Division "J" to Division "K."

*677 On July 2, 1996, substitute counsel appeared for LTM at a hearing concerning the UNCC bank accounts. On behalf of LTM, substitute counsel objected to jurisdiction, based on the proceedings concerning the original judge's disqualification.
The substitute judge assured LTM's new counsel that there was no jurisdictional problem, explaining that when the original judge recused himself, the substitute judge took the case with the parties' consent. The judge further stated that he refused UNCC's request to schedule a hearing until the chief judge assigned the case to him. The substitute judge then advised that "the chief judge, assigned me to handle the case."
The record reflects that the original judge orally disqualified himself from presiding at proceedings alleged to be an emergency. In the circumstances, it appears the substitute judge acted properly in hearing and determining the matters presented, until such time as a formal appointment could be accomplished. The appointment procedure could be considered somewhat irregular, due to the fifteen-day delay in entering a written recusal order, and the fact that the substitute judge subsequently took administrative action in a case from which he had been disqualified. However, we are persuaded that if procedural irregularity occurred in the appointment of the second judge, it was de minimis, and the appointment was valid.
Accordingly, we reverse the order enforcing settlement, and remand this cause for further proceedings.
WOLF and VAN NORTWICK, JJ., concur.
NOTES
[1] The record reflects that in 1992, Liuzzo pled guilty to Medicaid fraud in New York state.
[2] LTM's president testified the draft agreement was sent to UNCC at 5:00 p.m. on May 28, 1996. Instead of preparing an alternate proposal in accordance with UNCC's position regarding the $150,000, UNCC prepared and filed its motion to enforce settlement, based on the terms in the order enforcing settlement which UNCC included with its motion to enforce.