[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-10701

————————————————

D.C. Docket No. 3:13-cv-00306-JRK

CABLEVIEW COMMUNICATIONS
OF JACKSONVILLE, INC.,

Plaintiff - Appellant,

versus

TIME WARNER CABLE SOUTHEAST, LLC,
and TIME WARNER ENTERTAINMENT-ADVANCE/
NEWHOUSE PARTNERSHIP, LLC,

Defendants - Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(August 23, 2018)

Before NEWSOM, BRANCH, and ANDERSON, Circuit Judges.

BRANCH, Circuit Judge:

Cableview Communications of Jacksonville, Inc. ("Cableview"), appeals the grant of summary judgment in favor of Time Warner Cable Southeast, LLC, and Time Warner Entertainment–Advance/Newhouse Partnership (collectively, "Time Warner") on Cableview's suit to recover a $560,000 payment it made to Time Warner based on a disputed indemnity claim. In February 2012, Cableview was in the process of selling most of its assets and assigning its 2011 Installation Agreement ("Installation Agreement") with Time Warner to FTS USA, LLC/Unitek Global Services, Inc. ("FTS"). Assignment of the Installation Agreement required Time Warner's written consent, which Time Warner refused to give until its indemnity claim against Cableview was resolved. Payment of the indemnity claim was worked into the Asset Purchase Agreement ("APA") between Cableview and FTS so that Cableview would pay Time Warner directly from the proceeds of the transaction.

Following payment of the claim in the APA, Cableview asserted claims of tortious interference with a business relationship, negligent misrepresentation, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),[1] Fla. Stat. § 501.204, against Time Warner based on the way Time Warner obtained settlement of the indemnity claim. The district court granted summary judgment in favor of Time Warner after concluding that Cableview voluntarily paid Time

---

[1] Florida law governs Cableview's claims against Time Warner concerning the APA.

2

Warner pursuant to a valid settlement agreement. On appeal, Cableview argues that the settlement agreement is invalid for lack of sufficiently definite terms and because it was the result of duress. Cableview also argues that even if the settlement is valid, it does not foreclose its claims.

We conclude that there are two disputed issues of fact: (1) whether Time Warner initially gave its consent to the Installation Agreement assignment through its director of technical operations Anthony Sieiro, and (2) whether Time Warner entered into new vendor contracts with FTS, which it later revoked, that made formal assignment of the Installation Agreement unnecessary. However, we conclude that those disputed issues are not material and that a reasonable jury could not find for Cableview on duress. We also conclude that the settlement agreement contains sufficiently definite terms and that Cableview cannot succeed on its other claims despite the settlement. Therefore, we affirm.

## I.    FACTUAL BACKGROUND

This case arises from an accident on June 18, 2008, in which a Cableview employee, James McLarty, was injured when the utility pole on which he was working collapsed. The utility pole was owned by Duke Energy Carolinas, LLC ("Duke Power"). McLarty had been working under a 2004 Installation Agreement between Cableview and Time Warner, in which Cableview agreed to install and maintain cables on Duke Power's utility poles for Time Warner. Time Warner had

entered into a Pole Attachment Agreement with Duke Power in 1996 that allowed this access to Duke Power's utility poles.

Under the Pole Attachment Agreement, Time Warner agreed that it would indemnify Duke Power for injuries related to Time Warner's cables and Duke Power's poles unless caused by the sole negligence of Duke Power. The 2004 Installation Agreement also had an indemnity provision requiring Cableview to indemnify Time Warner against claims arising out of it. The 2004 Installation Agreement was superseded by a new contract in 2011.

McLarty sued Duke Power and Enerco Energy Services—the company that inspected and maintained Duke Power's poles—in the Superior Court of Durham County, North Carolina, on July 21, 2010. Duke Power tendered the McLarty case to Time Warner for defense and indemnification under the Pole Attachment Agreement. On September 23, 2010, Time Warner tendered the action to Cableview and its insurer, First Mercury, under the 2004 Installation Agreement. Cableview and its insurance company rejected the tender, disputing that the 2004 Installation Agreement required it to indemnify Time Warner for the McLarty action. Time Warner defended Duke Power in the litigation, the parties settled on February 16, 2012, and Duke Power agreed to pay McLarty $362,500. Time Warner asserts that it incurred at least $560,000 to defend and settle the action.

4

Around the same time, Cableview was in negotiations to sell most of its assets, and to assign the Installation Agreement, to FTS. Cableview and FTS set March 2, 2012, as the closing date for the Asset Purchase Agreement, which would include assignment of the Installation Agreement. The Installation Agreement provided that any assignment, including assignment resulting from a change in ownership, required written consent from both parties.

Glenn Gravley, a system coordinator for Cableview, testified that in early 2012, he informed Time Warner director of technical operations Anthony Sieiro that FTS would be taking over the Greensboro, North Carolina, operations of Cableview. He testified that he did not ask Sieiro or anyone else for Time Warner's consent to the assignment of the Installation Agreement and no one had told him that Time Warner consented to the assignment. He also testified that he understood that Sieiro did not have authority to give Time Warner's consent to the assignment. Gravley sent an email to Cableview's president Jim Schieszer on January 11, 2012, stating that he spoke with Sieiro regarding changes in the company but never discussed assignment of the Installation Agreement. Schieszer testified that he "met with Tony Sieiro in mid to early February [2012] and asked him if he would approve the sale of [Cableview's] assets to [FTS], and [Sieiro] said yes."[2]

---

[2] Schieszer first said that he asked Sieiro if he would approve of Cableview selling its assets to Time Warner. Later, he stated that he asked if Cableview could transfer its assets to FTS. We

Schieszer also testified that he did not specifically mention the Installation Agreement.

Sieiro denied that he stated that Time Warner would consent to assignment of the Installation Agreement. He also testified about the nature of his job as a technical operations director. He explained that his job involved vetting new vendors by meeting with them and determining what they could bring to a business relationship with Time Warner. Once he was satisfied that Time Warner could do business with the vendor, he would "have corporate send them the forms to fill out" and then the arrangement would "go[] through an approval process" involving the assistant vice president, the regional vice president, and the senior vice president. There was also a renewal process that involved updating a vendor's information.

On February 17, 2012, Time Warner commenced a lawsuit against Cableview in the Superior Court for Mecklenburg County, North Carolina, on its indemnity claim by filing an application extending the time within which to file its complaint. That same day the summons was issued, and Time Warner's outside counsel Lew Glenn sent Cableview the summons and application via fax. Time Warner timely filed its complaint on March 8, 2012, alleging that Cableview

assume that the former statement was made in error because there is no evidence in the record that Cableview ever sought to sell its assets to Time Warner.

6

violated its contractual indemnity obligation to Time Warner with respect to the McLarty action.

Meanwhile, on February 28, 2012, Time Warner assistant vice president Dianne Blackwood spoke on the telephone with Cableview president Schieszer. According to Schieszer's testimony, Blackwood told him that Time Warner would not consent to assignment of the Installation Agreement unless the McLarty indemnity issue was resolved. Schieszer testified that he told Blackwood "that [he] would look into it" and he "would do everything possible. I needed to—you know, make her happy." He also testified that he said that everything should go through the insurance company and that he would leave the wording of the "closing settlement" to the attorneys. Schieszer also sent an email that day to FTS CEO Chris Perkins, explaining that Time Warner was asserting an indemnity claim and that Cableview had agreed that it would be responsible for resolving the McLarty indemnity issue. Schieszer explained in his deposition that, at the time of that email, he still anticipated that Cableview's insurance company would cover the indemnity payment.

On March 1, 2012, Time Warner gave FTS notice via a letter and an email that Time Warner had asserted an indemnity claim against Cableview and would not consent to the assignment of the 2011 Installation Agreement until the matter was resolved. The next day, Time Warner, through Blackwood, gave its written

consent to assignment of the 2011 Installation Agreement. Also that day, FTS and Cableview signed the APA, which, as amended, provided that FTS would purchase substantially all of Cableview's assets and would assume Cableview's rights and obligations with respect to Time Warner under the 2011 Installation Agreement. The APA also provided that on receipt of joint wiring instructions from Cableview and Time Warner, FTS would pay Time Warner the McLarty claim amount out of the amount it paid Cableview for the sale. The APA made reference to Time Warner's North Carolina action, referring to Time Warner as "the plaintiff in the TW Action" and the McLarty claim amount as the "TW Claim Amount."

On May 21, 2012, and May 22, 2012, Time Warner's outside counsel Glenn and Cableview's counsel Jack Webb negotiated the joint wiring instructions. On May 23, 2012, Glenn and Webb sent the joint wiring instructions to FTS, which authorized the disbursement of $560,000 to Time Warner for the McLarty claim and the remainder of the $1.9 million purchase price to Cableview. Time Warner's North Carolina action was dismissed for failure to prosecute on October 28, 2012.

## II.    PROCEDURAL HISTORY

Cableview filed the present litigation against Time Warner on March 21, 2013. The operative complaint is Cableview's second amended complaint which raises claims of tortious interference with a business relationship, negligent misrepresentation, and violation of the FDUTPA arising out of the APA's

purported settlement of the indemnity claim. The parties filed cross motions for summary judgment. Time Warner argued in part that Cableview paid Time Warner under a valid settlement agreement, or alternatively, accord and satisfaction. Cableview responded that the settlement agreement did not contain sufficient definiteness of terms because the APA was signed before Time Warner filed its complaint on March 8, 2012, and the joint wiring instructions modified the payment amount. Cableview also asserted in a footnote in its opposition to Time Warner's motion for summary judgment that Cableview could set aside the settlement for duress because Time Warner "had no legal right to indemnification and its interference was not lawful."

In its sur-reply on Time Warner's motion for summary judgement, Cableview asserted that in January and February 2012 Time Warner entered into new vendor contracts with FTS that provided that FTS would assume Cableview's obligations under the Installation Agreement for providing service in the Greensboro region.[3] For support, Cableview relied on an email FTS's general counsel Kyle Hall sent to Time Warner's outside counsel Glenn on March 2, 2012, stating that Time Warner and FTS executed "the Columbus/SW Ohio contract"

---

[3] Although it was not clear in Cableview's sur-reply the role these contracts served in Cableview's argument, on appeal Cableview has linked the new vendor contracts to its argument about duress. Cableview has stated in its reply brief on appeal that it learned about these new vendor contracts in discovery. Cableview appears to argue that Time Warner entered into new vendor contracts that made assignment of the Installation Agreement unnecessary in order to induce Cableview to transfer its operations to FTS so that when Time Warner insisted on giving its consent to the assignment Cableview had no alternative but to pay the indemnity claim.

9

that included the Greensboro market on February 17, 2012. According to Cableview, preparations for that contract began at least on January 31, 2012 when Sieiro's executive assistant, Britt White, sent an email to Gravley attaching a new vendor form that would need to be completed for FTS to be set up as a new vendor of Time Warner. Sieiro testified that he did not recall seeing that email. Cableview also relied on a February 14, 2012 email that FTS CEO Perkins sent to Sieiro, Schieszer, and others about FTS's acquisition of Cableview, asking for patience as FTS begins "transitioning [its] business to a [Time Warner] compliant model." However, the new vendor contracts themselves are not in the record.

The district court granted Time Warner's motion and denied as moot Cableview's motion because the court concluded that Cableview paid Time Warner under a valid settlement agreement and that Cableview did not enter that agreement under duress. In particular, with regard to the duress allegation, the district court determined that Cableview could not show that Time Warner engaged in wrongful conduct because Time Warner had a right to withhold its consent to the assignment of the Installation Agreement and to assert its indemnity claim. The district court also determined that Cableview could not establish that it had no alternative because Cableview could have insisted on litigating the indemnity claim in court. Finally, the district court concluded that Cableview could not succeed on its claims of tortious interference, negligent misrepresentation, and

10

violation of the FDUTPA because the same facts establishing the settlement agreement foreclosed those claims.

## III.   STANDARD OF REVIEW

We review "a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). We will affirm "if we conclude that there is no genuine issue of material fact—that is, if no 'fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## IV.   DISCUSSION

There are two disputed factual issues in this case: (1) whether Sieiro initially stated that Time Warner would agree to assignment of the Installation Agreement, and (2) whether Time Warner entered into new vendor contracts with FTS, which it later revoked, that made formal assignment of the Installation Agreement unnecessary. Cableview argues that those two facts establish that Time Warner engaged in wrongful conduct that induced Cableview to consent to the settlement under duress. However, those disputed issues are not material and a reasonable jury could not find for Cableview on duress. The evidence presented does not establish that Time Warner engaged in wrongful acts or threats in negotiating the

11

settlement, and even if it had, Cableview cannot show Time Warner caused a situation in which Cableview had no alternative. We also conclude that the district court did not err in finding that the settlement agreement contains sufficiently definite terms and that Cableview's claims of tortious interference, negligent misrepresentation, and violation of the FDUTPA are foreclosed by the settlement. Accordingly, we affirm.

A.    <u>A Reasonable Jury Could Not Find Duress Based on the Evidence Presented.</u>

Under Florida law, settlement agreements are interpreted and governed by principles of contract law. *Barone v. Rogers*, 930 So. 2d 761, 763–64 (Fla. 4th Dist. Ct. App. 2006). Florida contract law provides that a party may rescind an agreement for duress if that party can show that the contract "was effected involuntarily and thus not as an exercise of free choice or will and . . . that this condition of mind was caused by some improper and coercive conduct of the opposite side." *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d Dist. Ct. App. 1981). As the party seeking to rescind the settlement agreement, Cableview is required to establish that Time Warner engaged in wrongful acts or threats that caused a situation in which it had no alternative. *See Corporacion Peruana de Aeropuertos y Aviacion Comercial v. Boy*, 180 So. 2d 503, 504–05 (Fla. 2d Dist. Ct. App. 1965). For the reasons that follow, Cableview cannot do so.

12

      i.      <u>Cableview Cannot Establish that Time Warner Engaged in Wrongful Acts or Threats.</u>

Cableview's argument concerns three actions that it alleges Time Warner took with respect to the APA that amount to wrongful acts or threats: (1) Time Warner conditioned its consent to the assignment of the Installation Agreement on resolution of its indemnity claim; (2) Time Warner, through Sieiro, initially gave its consent to the assignment of the Installation Agreement and later withdrew that consent; and (3) Time Warner entered into new vendor contracts with FTS that made assignment of the Installation Agreement unnecessary and then revoked those contracts. We consider each of those actions in turn.

Cableview's primary argument is that it was improper for Time Warner to condition its consent to the assignment of the Installation Agreement on resolution of its indemnity claim. But such conduct cannot support a claim for duress because Time Warner had a legal right to withhold its consent. Duress "cannot be predicated upon a demand which is lawful, upon doing or threatening to do that which a party has a legal right to do." *Spillers v. Five Points Guar. Bank*, 335 So. 2d 851, 853 (Fla. 1st Dist. Ct. App. 1976) (quoting *Kohen v. H.S. Crocker Co.*, 260 F.2d 790, 792 (5th Cir. 1958)). Cableview does not dispute that Time Warner had the legal right to withhold its consent to assignment of the Installation Agreement. Nor does Cableview dispute that Time Warner could have simply refused to give its consent without explanation. Cableview argues that it was nevertheless

13

wrongful for Time Warner to threaten to withhold its consent unless Cableview agreed to pay the indemnity claim. However, Time Warner did not threaten to do something illegal or wrongful. It threatened to withhold its consent to the assignment—something it had a legal right to do. Further, Time Warner also had a right to assert its indemnity. Therefore, it was not a wrongful act rising to the level of duress for Time Warner to condition its consent on resolution of the indemnity claim.[4]

Cableview also argues that it was wrongful for Time Warner to give its consent to the assignment through Sieiro, and then revoke that consent, and insist on withholding its consent. Cableview relies on Schieszer's testimony that Sieiro told him that "he would approve the sale of [Cableview's] assets to [FTS]." But Schieszer also testified that he did not specifically refer to the Installation Agreement in their conversation. Time Warner disputes that this testimony establishes that Sieiro stated that Time Warner would consent to the assignment, rather than that Time Warner would agree to the sale of Cableview to FTS.

---

[4] Cableview argues that it was wrongful for Time Warner to assert its indemnity claim because Cableview disputes that claim. Cableview's argument, however, would render settlement agreements null. The parties to a settlement agreement will almost always disagree about the merits of a claim, and if only undisputed claims could be settled, it would defeat the purpose of settlement. *See Long Term Mgmt., Inc. v. Univ. Nursing Care Ctr., Inc.*, 704 So. 2d 669, 673 (Fla. 1st Dist. Ct. App. 1997) ("Settlements are highly favored as a means to conserve judicial resources, and will be enforced when it is possible to do so."). To be sure, asserting an indemnity claim with no basis in law or fact could potentially serve as the basis of duress. But, as the district court concluded, that is not the case here. Time Warner presented some evidence that the accident did not occur solely because of Duke Power's negligence, and, therefore, that it was required to defend Duke Power. Thus, it was not wrongful for Time Warner to assert its reasonable indemnity claim.

However, for purposes of summary judgment, we must view this evidence in the light most favorable to Cableview and assume Sieiro did represent that Time Warner would consent to assignment of the Installation Agreement.

Cableview asks us to infer from the fact that Sieiro was the contact for new vendor approval that Sieiro had authority to give Time Warner's consent to assignment of the Installation Agreement. But that inference is unreasonable for several reasons. First, Gravley testified that he was aware that Sieiro did not have authority to give Time Warner's consent to the assignment. Second, when Time Warner did give its written consent to assignment of the Installation Agreement, pursuant to the settlement, it was Blackwood, not Sieiro, who signed for Time Warner. Third, Sieiro's testimony concerning his job duties refutes Cableview's assertion. Sieiro testified that his job was to meet with new vendors and decide whether Time Warner could do business with them. That task is different from reviewing, negotiating, or approving contracts, and there is no evidence in the record that Sieiro's job included those tasks. Also, Sieiro testified that, even in matters of new vendor approval, his decisions were not final and had to be approved by the assistant vice president, the regional vice president, and the senior vice president.

But even if Sieiro did have the authority to give Time Warner's consent, assignment of the Installation Agreement still required Time Warner's written

15

consent. And it was not wrongful for Time Warner to insist that it be given the opportunity to provide its consent in writing, as it had a legal right to do.

Finally, Cableview argues that Time Warner engaged in wrongful conduct by entering into new vendor contracts with FTS that made assignment of the Installation Agreement unnecessary and then revoking those contracts. Cableview claims that Time Warner revoked those contracts when Time Warner insisted upon formal assignment of the Installation Agreement and that a reasonable jury could find duress based on those contracts. However, the terms of those contracts are not in the record. And without knowing the terms of those contracts, it is impossible for a jury to determine whether those contracts in fact made assignment of the Installation Agreement unnecessary.[5] For instance, Time Warner could have entered into contracts with FTS for the performance of other work in Greensboro not covered by the Installation Agreement. Therefore, based on the evidence presented, a reasonable jury could not conclude that Time Warner engaged in wrongful conduct by entering into new vendor contracts with FTS.

---

[5] The new vendor contracts would have made assignment of the Installation Agreement unnecessary if they had required FTS to perform the same obligations that Cableview had under the Installation Agreement. The result would have been that Cableview and FTS could execute the APA without assigning the Installation Agreement because both FTS and Time Warner would have received under the new vendor contracts the benefits they anticipated from assignment of the Installation Agreement.

16

ii.    <u>Even if Time Warner Did Engage in Wrongful Acts, Cableview Cannot Show that Those Wrongful Acts Caused a Situation in Which It Had No Alternative.</u>

Cableview argues that Time Warner's wrongful acts caused a situation in which it had no alternative because at the time that Time Warner asserted its indemnity claim, Cableview had already transferred most of its operations to FTS and could not postpone the APA closing. Cableview's argument is based on the underlying premise that it reasonably relied on Sieiro's assurances that Time Warner would consent and on Time Warner's contracts with FTS. For the following reasons, we conclude that a reasonable jury could not find reasonable reliance.

First, Cableview cannot show that it reasonably relied on Sieiro's statement because it knew that Sieiro lacked authority to give Time Warner's consent. As discussed earlier, the record shows that Sieiro did not have authority to consent to the assignment and the Installation Agreement. But, most important for purposes of establishing reliance, Cableview knew—as Gravley testified—that Sieiro lacked such authority. Cableview also knew that it could not assign the Installation Agreement without Time Warner's written consent. Given that Cableview knew both that Sieiro lacked authority to consent to the assignment and that his oral consent would be legally insufficient even if he had authority, it was unreasonable for Cableview to rely on his statement.

17

Second, Cableview did not reasonably rely on the new vendor contracts. Cableview argues that the new vendor contracts led it to believe that assignment of the Installation Agreement was unnecessary and that it could transfer its operations to FTS without consequence. But that argument fails because, as Cableview admits, it learned about the new vendor contracts in discovery—well after execution of the settlement agreement. Therefore, Cableview could not have reasonably relied in transferring its operations to FTS in anticipation of the closing of the APA.[6]

Finally, the parties' relative bargaining power further refutes Cableview's argument that it involuntarily consented to the settlement agreement. Duress requires "improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." *Cooper v. Cooper*, 69 So. 2d 881, 883 (Fla. 1954) (quoting *Herald v. Hardin*, 116 So. 863, 864 (Fla. 1928)). "In determining whether a complainant acted under his or her own free will, a court should take into consideration all circumstances surrounding the transaction, including . . . [the] level of knowledge of the complaining party." *Smith v. Paul Revere Life Ins. Co.*, 998 F. Supp. 1412, 1416 (S.D. Fla. 1997) (citing *Burton v. McMillan*, 42 So. 849, 851 (Fla. 1907)).

---

[6] While the new vendor contracts could suggest that Time Warner had anticipated that it would eventually agree to assignment of the Installation Agreement, Time Warner nonetheless had a right to withhold its written consent to the assignment.

18

Accordingly, where the parties to a contract are of relatively equal bargaining power and business sophistication, courts are generally less likely to find that one party entered into the contract involuntarily. *See Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1161 (Fla. 2014) (explaining in the context of unconscionability, that where "two sophisticated commercial enterprises or businesses negotiate a contract where both sides are on equal footing . . . the chance that the terms of the contract are unduly oppressive is lessened"). Both Cableview and Time Warner were experienced business entities and both were represented by counsel throughout the negotiations.[7]

B.    The District Court Also Did Not Err in Determining that the Settlement Contained Sufficiently Definite Terms and that the Settlement Barred Cableview's Claims.

Cableview argues that the settlement lacks sufficient definiteness of terms, and that Cableview could succeed on its claims even if it voluntarily agreed to pay Time Warner. For the reasons that follow, both arguments are unpersuasive.

Cableview argues that the settlement agreement fails for lack of sufficient definiteness of essential terms because the payment increased from $515,303.17 to

---

[7] Cableview argues that the district court failed to fully consider the amount of work and preparation that went into preparing for the closing of the APA. Cableview certainly was in a difficult situation. However, "the pressure of financial circumstances" standing alone is insufficient to establish duress. *Spillers*, 335 So. 2d at 853 (quoting *Kohen*, 260 F.2d at 792). A party seeking to void a contract for duress must establish that it had no alternative as a result of the improper or wrongful conduct of another. *Kory*, 394 So. 2d at 497.

19

$560,000.[8] To be enforceable, a settlement agreement "must be sufficiently specific and mutually agreeable as to every essential element." *Long Term Mgmt.*, 704 So. 2d at 673 (quoting *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. 1st Dist. Ct. App. 1992)). However, if "a clear understanding" of the agreement is apparent on the record, the settlement is effective even if "it was subject to being reduced to writing at a later time." *Farrell v. Farrell*, 661 So. 2d 1257, 1259 (Fla. 3d Dist. Ct. App. 1995). The payment increase does not make the terms of the agreement indefinite because it is clear from the record that the parties agreed to the terms of the settlement between March and May 2012. On March 2, 2012, Time Warner gave its consent to assignment of the installation agreement in exchange for the inclusion of the indemnity claim, in the amount of $515,303.17, in the APA.[9] Also in the APA, the parties agreed that Cableview would pay Time Warner out of the proceeds of the sale to FTS in accordance with the joint wiring instructions. Then on March 8, 2012, Time Warner filed its complaint in the North Carolina litigation, which it had initiated on February 17, 2012. In May 2012, Time Warner and Cableview negotiated the joint wiring instructions agreeing that Cableview would pay Time Warner $560,000 and Time Warner would cease prosecution of the North Carolina litigation. The record shows a clear understanding of the terms of

---

[8] Cableview also argued before the district court that the increased payment amount failed for lack of consideration. However, Cableview does not raise that argument on appeal.

[9] The APA referred to the North Carolina litigation that Time Warner initiated against Cableview concerning the indemnity claim on February 17, 2012 by filing an application for an extension of time.

20

the agreement, including the payment amount of $560,000 pursuant to the joint wiring instructions. Therefore, the district court did not err in determining that Cableview and Time Warner entered into a valid settlement agreement between March and May 2012 as contained in the APA and the joint wiring instructions.

Cableview also argues that, even if a settlement exists, it could still succeed on its claims for tortious interference, negligent misrepresentation, and violation of the FDUTPA because it did not release those claims under the settlement agreement. Cableview's position is erroneous. The question is not whether Cableview agreed not to sue Time Warner under the settlement; the district court did not find that it did so, and Time Warner does not so argue. Rather, the district court concluded that the same facts establishing that the parties entered into a valid settlement agreement also defeat Cableview's claims of tortious interference, negligent misrepresentation, and violation of the FDUTPA. We take each claim in turn.

First, as already discussed, Cableview cannot establish that Time Warner engaged in wrongful conduct by conditioning its consent to assignment of the Installation Agreement on payment of the indemnity claim. Therefore, Cableview also cannot establish that Time Warner's conduct amounts to tortious interference, which requires wrongful action. *See Barco Holdings, LLC v. Terminal Inv. Corp.,* 967 So. 2d 281, 292–93 (Fla. 3d Dist. Ct. App. 2007) (explaining that "no cause of

action for intentional interference exists which is the consequence of a rightful action" (quoting *Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358 (Fla. 3d Dist. Ct. App. 2006)).[10] Similarly, Cableview cannot establish unfair or deceptive acts under the FDUTPA because it cannot show that Time Warner wrongfully withheld its consent to the assignment. *See* Fla. Stat. § 501.204(1) (prohibiting "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices"). Finally, Cableview's negligent misrepresentation claim fails because, as already discussed herein with respect to duress, Cableview could not have reasonably relied on Sieiro's oral statement. *See Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st Dist. Ct. App. 2011) (explaining that "a claim for negligent misrepresentation

---

[10] Cableview relies on *Wright v. Nigh* for the proposition that settlement of a contract claim does not necessarily release claims for tortious interference with that contract. However, *Wright v. Nigh* establishes only that "settlement of the contract claim does not, without more, release the tort claim" with respect to that contract. 399 So. 2d 515, 517 (Fla. 4th Dist. Ct. App. 1981). What the district court correctly found is that the same facts that establish a valid settlement agreement in this case foreclose Cableview's tortious interference claim. Because Time Warner had a legal right to withhold its consent to the assignment and assert its indemnity claim, Cableview cannot show the wrongful acts necessary to establish tortious interference.

Cableview also argues that the right to approve of an assignment of a contract does not make the assignor immune to tortious interference claims arising from the purposeful causing of a breach of contract. *See Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926, 927–28 (Fla. 3d Dist. Ct. App. 1998). Cableview's argument is correct. However, such rule does not apply where the party alleged to have interfered "was exercising the option for a proper purpose." *Id.* at 928. For example, "a cause of action for tortious interference does not exist against one [that is itself] a party to the business relationship" and where its actions were "undertaken to safeguard or promote [its own] financial or economic interest." *Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d Dist. Ct. App. 1986). Because Time Warner had the right to withhold its consent and assert its indemnity claim, a reasonable jury could not find that Time Warner was acting for an improper purpose.

22

under Florida law requires a showing that the recipient of the information justifiably relied on the erroneous information").

## V.    <u>CONCLUSION</u>

The judgment of the district court is **AFFIRMED**.

ANDERSON, Circuit Judge, dissenting:

I respectfully dissent. Although this is a close case, I am persuaded that there are material issues of fact regarding whether Cableview entered the settlement with Time Warner under duress. First, I believe that there are material issues of fact regarding whether Time Warner, through Sieiro and the other Time Warner regional operations directors, negligently misrepresented to Cableview that Sieiro had authority to consent for Cableview to transfer its operations to FTS or that FTS could assume Cableview's previous responsibilities via new vendor contracts without the necessity of a formal assignment. Although Gravely testified during litigation that he knew that Sieiro did not have authority to consent to the transfer, there is evidence in the record from which a reasonable jury could conclude that Sieiro and the other Time Warner regional operations directors represented to Schieszer and others at Cableview that they did have such authority. For example, there are emails suggesting that there was a miscommunication at Time Warner regarding the approval of the Cableview-FTS transaction. And there are emails referencing new vendor contracts (entered into before the March 2, 2012 closing date and before Blackwood's February 28 telephone call) under which FTS would assume Cableview's duties. I am persuaded that this and other record evidence could lead a reasonable jury to conclude that Sieiro mistakenly indicated Time Warner's consent to the transfer without consulting with the proper people at Time

24

Warner or mistakenly indicated to Cableview that FTS could assume Cableview's duties via new vendor contracts without a formal assignment.

Regarding whether it was reasonable for Cableview to rely on representations that were not in writing, as noted above, there is evidence suggesting that, Time Warner offered and, in some regions, entered into new vendor contracts with FTS. These new vendor contracts are not in the record; however, emails in the record referring to the contracts would allow a reasonable jury to conclude that the new vendor contracts allowed FTS to assume Cableview's previous responsibilities with respect to installing and maintaining the cable wires, making a formal written assignment of the Installation Agreement unnecessary.[1]

Finally, there are emails in the record suggesting that substantial implementation of the transfer from Cableview to FTS was commenced by mutual consent before Blackwood called Schieszer and told him that Time Warner would not consent to assign the Installation Agreement unless Cableview paid Time

---

[1] The majority relies on Cableview's statement in its reply brief that it "uncovered" in discovery the new vendor contracts to support its conclusion that Cableview could not have reasonably relied on the new vendor contracts. But Cableview president Schieszer emailed Perkins at FTS regarding the new vendor contracts in late February 2012, indicating that, "[Sieiro's assistant at Time Warner] says this has to be filled out and faxed to her ASAP. She says this should be all you need." This and other emails (e.g., emails relating to the new vendor contracts) could lead a reasonable jury to find that Cableview knew about the new vendor contracts and relied on them during the time leading up to the Cableview-FTS transaction. In light of record evidence that Cableview's agents, including its president, did know of the vendor contracts, and in the context of the reply brief, Cableview's reference in its reply brief to "uncover[ing]" the new vendor contracts in discovery reasonably refers merely to Cableview's counsel uncovering the contracts in discovery.

Warner to settle the McLarty indemnity action. Based on these emails, a reasonable jury could conclude that Cableview had no reasonable alternative but to agree to pay Time Warner for the McLarty indemnity claim.

Because I believe that such material issues of fact indicate that the district court erred in finding that there was a valid settlement agreement as a matter of law, I respectfully dissent.